ARKANSAS DEPARTMENT of HEALTH &
HUMAN SERVICES *v.* Jessica JONES and Jacob Hines

CA 06-630 248 S.W.3d 507

Court of Appeals of Arkansas
Opinion delivered January 31, 2007

[Rehearing denied March 7, 2007.]

*Gray Allen Turner*, Arkansas Dep't of Health & Human Servs., Office of Chief Counsel, for appellant.

*Linda C. Ward*, for appellee.

SAM BIRD, Judge. The Arkansas Department of Health and Human Services (DHHS) appeals from a probable cause and closing order of the Sebastian County Circuit Court placing custody of JTH with his paternal grandparents and closing the case. DHHS argues on appeal that the circuit court abused its discretion (1) by closing the case without conducting an adjudication hearing; (2) by granting custody to the paternal grandparents without requiring that a home study be conducted by a "licensed certified social worker"; (3) by granting permanent custody at a probable-cause hearing; (4) by granting custody to out-of-state relatives without approval from the Oklahoma DHS; and (5) by granting permanent custody to the paternal grandparents. We affirm.

### Facts

At 4:48 p.m. on January 14, 2006, the Fort Smith Police Department received a call regarding an unattended child, JTH, left in a locked car at Central Mall. JTH was two years old at the time. The police responded immediately and arrested Jessica Jones,

JTH's mother, for endangering the welfare of a minor when she returned to the car five minutes after the police arrived. The police called a family-services worker at DHHS, who placed a 72-hour hold on JTH at approximately 5:00 p.m.

On January 17, 2006, DHHS filed a petition for emergency custody. The circuit court granted the petition that same day, placing JTH in the custody of DHHS pending further orders of the court. The circuit court scheduled a probable-cause hearing on the matter for January 19, 2006. On January 18, 2006, Jacob Hines, JTH's father, filed a petition to establish paternity and also requested the court to enter an order placing JTH in the temporary or permanent custody of the paternal grandparents, Iva and Thomas Hines.

Testimony at the probable-cause hearing was provided by both of JTH's parents, his paternal grandmother, and his maternal grandmother. All testified that they lived in Sallisaw, Oklahoma. Both parents testified that Jacob Hines was the biological father of JTH and that a paternity order should be entered without DNA testing. They also said that JTH had lived with his paternal grandparents since April 2005, that the grandparents had provided excellent care, that all of the parties got along well for purposes of visitation, and that they wanted custody of JTH to remain with the paternal grandparents. Mrs. Hines testified that she loved JTH and that he had been living with her husband and her since April 2005. She also told the court that JTH was covered under their health-insurance policy, that she and JTH's mother got along well, and that she intended to continue caring for JTH.

The father's attorney introduced a home study performed by Martha L. Wells, a licensed social worker for the State of Arkansas, without objection. Attached to the home study were several letters from members of the community: (1) letters from several neighbors, who stated that the Hineses were good parents and respected in the community; (2) a letter from the Hineses' loan officer, who stated that Mrs. Hines had been the primary caregiver of JTH since he was an infant and that she was a good parent; (3) a letter from a local lawyer, who opined that the Hineses were qualified to accept care and custody of JTH and added that they were hardworking, honest, kind, considerate, and financially able to support JTH; (4) a letter from the Hineses' accountant stating that he knew the Hineses to be of sufficient means to provide support for JTH; (5) two letters from the Oklahoma DHS stating that — other than the incident at the Fort Smith mall — there were no reported incidents

regarding JTH and that there were no reports of abuse or neglect connected with either of the Hineses; and (6) a letter from the local district attorney's office stating that Mrs. Hines had never been convicted of a felony or misdemeanor of any kind.

Ms. Wells reported that the Hineses lived in a recently built, three-bedroom home on a two-thousand acre farm. She noted that the Hineses had lived on the farm for the past twenty-five years. Ms. Wells reported that upkeep and maintenance on the home were very good, that the home was adequately furnished, and that JTH had his own bedroom. The report indicated that Mr. Hines was a self-employed contractor and also sold cattle. He reported gross earnings last year of $450,000. The report also stated that Mrs. Hines did not work outside the home, had been JTH's primary caregiver since he was an infant, and was available to care for JTH most of the time. Ms. Wells stated that, when Mrs. Hines was not available, one of her sisters who lived nearby cared for JTH. Ms. Wells's report indicated that all of the references stated that the Hineses were good parents and well thought of in the community. Ms. Wells reported in her recommendation that the Hineses were "appropriate to be considered as custodial parents for [JTH]."

The attorney ad litem told the court that she considered Mrs. Hines an appropriate person to care for JTH and had no strong objection to placing him with her. The attorney for the father asked the court to place permanent, or at least temporary, custody of JTH with the Hineses. The mother's attorney stated that she had no objection to the child being placed with the Hineses. The attorney for DHHS objected to custody being granted to the Hineses and requested the court to order a home study pursuant to the Interstate Compact on the Placement of Children (ICPC)[1] within thirty days. In answer to the court's question about what services DHHS was proposing to provide for the family, DHHS replied: "at least parenting classes, if nothing else — I mean, the mom left the child alone, the police report says, for twenty minutes in a locked car at the Mall. At this point I can't think of any other services."

The circuit court made the following rulings from the bench: probable cause existed at the time JTH was taken into DHHS custody; the grandparents' home was "totally appropri-

---

[1] *See* Ark. Code Ann. § 9-29-201 (Supp. 2005).

ate"; Jacob Hines was the legal father of JTH; an approved home study was performed of the Hineses' home; and custody of the child was placed with the grandparents, Thomas and Iva Hines. Finding that no further services were necessary, the circuit court closed the case. After the circuit court announced its decision, DHHS objected to custody being placed with the grandparents and to the case being closed. On February 10, 2006, the circuit court entered an order setting forth its rulings. DHHS brings this appeal.

Our standard of review is de novo, but we will not reverse a circuit court's findings in a dependency-neglect case unless they are clearly erroneous or clearly against the preponderance of the evidence. *Moiser v. Ark. Dep't of Human Servs.*, 95 Ark. App. 32, 233 S.W.3d 172 (2006). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed. *Id.*

### Points on Appeal

For its first point on appeal, DHHS contends that the circuit court erred in closing the case at the conclusion of the probable-cause hearing without holding a full adjudication of all of the issues as required by Ark. Code Ann. § 9-27-315 (Supp. 2005). DHHS claims that the issues needing consideration include whether permanent custody was in the child's best interest, visitation, child support, and whether the parents should have been provided reunification services. JTH's father, Jacob Hines, responds, arguing that there was no need for an adjudication hearing in this case.[2] He claims that JTH's mother, father, and grandparents all testified at the probable-cause hearing that custody of JTH was with the grandparents for the nine months before the mall incident, that JTH was receiving excellent care, that all of them wanted custody to remain with the grandparents, and that they were all confident that visitation would continue to work well. Jacob also contends that DHHS had nothing substantial that it would require the parents to do and that neither parent was seeking reunification. Finally, he contends that the overwhelming evidence suggested that child support was neither needed nor requested in this case.

Arkansas Code Annotated section 9-27-315 provides that, following the issuance of an emergency order, the circuit court

---

[2] JTH's mother, Jessica Jones, did not file a brief in this appeal.

"shall hold a probable cause hearing within five (5) business days of the issuance of the ex parte order to determine if probable cause to issue the emergency order continues to exist." Ark. Code Ann. § 9-27-315(a)(1)(A) (Supp. 2005). While the statute limits the purpose of the probable-cause hearing to "determining whether probable cause existed to protect the juvenile" and to determining "whether probable cause still exists to protect the juvenile[,]" it provides that "issues as to custody and delivery of services may be considered by the court and appropriate orders for that entered by the court." Ark. Code Ann. § 9-27-315(a)(1)(B) (Supp. 2005). The statute then provides that "[a]ll other issues . . . shall be reserved for hearing by the court at the adjudication hearing[.]" Ark. Code Ann. § 9-27-315(a)(2)(A) (Supp. 2005). Subsection (d)(1) states that the court "shall set the time and date of the adjudication hearing" at the probable-cause hearing.

We disagree with DHHS that this statute requires the circuit court to hold an adjudication hearing. While an adjudication hearing is generally necessary in a dependency-neglect case in order for the circuit court to consider and determine all of the issues involved, the statute does not require the circuit court to hold such a hearing. Ark. Code Ann. § 9-27-315(a)(1)(B)(ii) specifically authorizes the court to consider and determine custody and delivery-of-services issues at the probable-cause hearing. *See also Miller v. Ark. Dep't Human Servs.*, 86 Ark. App. 172, 177, 167 S.W.3d 153, 156 (2004) (stating that regardless of the typical goal of a particular type of proceeding, the trial court is charged with reaching a decision that promotes the best interest of the child). The circuit court in this case determined that probable cause existed at the time DHHS put a hold on JTH and then considered and entered appropriate orders regarding custody and the delivery of services. If there had been additional issues for the circuit court to consider, it should have "set the time and date of the adjudication hearing" at the probable-cause hearing. The circuit court determined that there were no additional issues to consider. We agree and hold that the circuit court was not required to schedule a hearing in this case because it made a determination regarding custody and services at the probable-cause hearing, and visitation, child support, and reunification were not in issue.

As its second point, DHHS argues that a circuit court may not change custody unless a home study is conducted by a "licensed certified social worker" and Ms. Wells, who prepared

the home study in this case, was merely a "licensed social worker." In support of its argument, DHHS cites Ark. Code Ann. § 9-27-335(d) (Supp. 2005), which provides:

> Custody of a juvenile may be transferred to a relative or other individual only after a home study placement is conducted by the department or a licensed certified social worker and submitted to the court in writing and the court determines that the placement is in the best interest of the juvenile.

We reject DHHS's argument. DHHS did not object to Ms. Wells's qualifications, or lack thereof, when the home study was introduced during the hearing. In fact, DHHS did not object to introduction of the home study at all. We have long held that we will not consider arguments raised for the first time on appeal, and we decline to do so here. *See, e.g., Flowers v. State*, 92 Ark. App. 337, 341, 213 S.W.3d 648, 651 (2005); *Farr v. Farr*, 89 Ark. App. 196, 201, 201 S.W.3d 417, 421 (2005).

We also reject DHHS's third argument. DHHS claims that a circuit court may not grant permanent custody at a probable-cause hearing. We disagree. Ark. Code Ann. § 9-27-315(a)(1)(B) specifically provides that "issues as to custody and delivery of services may be considered by the court and appropriate orders for that entered by the court."

For its fourth point, DHHS argues that the circuit court abused its discretion by making an out-of-state placement without first receiving written authorization from the Oklahoma DHS as required by the Interstate Compact on the Placement of Children (ICPC). Article III of the ICPC states in pertinent part:

> (a) No sending agency shall send, bring, or cause to be sent or brought into any other party state any child for placement in foster care or as a preliminary to a possible adoption unless the sending agency shall comply with each and every requirement set forth in this article and with the applicable laws of the receiving state governing the placement of children therein.
>
> . . .
>
> (d) The child shall not be sent, brought, or caused to be sent or brought into the receiving state until the appropriate public au-

thorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child.

Ark. Code Ann. § 9-29-201(III) (Supp. 2005).

█ The Arkansas Supreme Court made it very clear in *Nance v. Arkansas Department of Human Services*, 316 Ark. 43, 870 S.W.2d 721 (1994), and in *Huff v. Arkansas Department of Human Services*, 347 Ark. 553, 65 S.W.3d 880 (2002), that the scope of the ICPC is limited to placement of a child in foster care or dispositions preliminary to an adoption. However, DHHS argues that the supreme court's holdings in *Nance* and *Huff* do not apply to this case because the legislature added a definition of "foster care" to the ICPC in 2003, which, DHHS argues, would include placement of JTH with the Hineses. We disagree.

The newly added definition states as follows:

(e)(1) "Foster care" means the care of a child on a twenty-four-hour-a-day basis away from the home of the child's parent or parents. The care may be by a relative of the child, by a non-related individual, by a group home, or by a residential facility or any other entity.

(2) In addition, if twenty-four-hour-a-day care is provided by the child's parents by reason of a court ordered placement, and not by virtue of the parent-child relationship, the care is foster care.

Ark. Code Ann. § 9-29-201(II) (Supp. 2005). This definition makes it clear that whether a situation is considered foster care depends not upon the relationship of the caregiver with the child but upon the reason for the placement of the child with the caregiver. Even placement with a child's own parents may be considered foster care. *See* Ark. Code Ann. § 9-29-201(II)(e)(2). Moreover, while a grandparent may serve as his grandchild's foster parent, a grandparent may also serve as guardian, custodian, or simply as a grandparent entitled to regular visitation. *See* Ark. Code. Ann. § 9-28-501 to -503 (Repl. 2002) (foster parent); *Freeman v. Rushton*, 360 Ark. 445, 202 S.W.3d 485 (2005) (guardian); *Freshour v. West*, 334 Ark. 100, 971 S.W.2d 263 (1998) (custodian); Ark. Code Ann. §§ 9-13-103, 107 (Supp. 2005) (visitation). The circuit court in this case did not place JTH in foster care with anyone. It simply restored custody of JTH to his paternal grandparents.

 Further, DHHS's argument distorts the purpose for and reason behind the ICPC. The purpose and policy behind the ICPC is for "party states to cooperate with each other in the interstate placement of children[.]" Ark. Code Ann. § 9-29-201(I) (Supp. 2005). "The provisions of this compact shall be liberally construed to effectuate the purposes thereof." Ark. Code Ann. § 9-29-201(X) (Supp. 2005). This case is not about "the interstate placement of children"; nor does it involve a territorial dispute between courts in different states regarding whose custody order controls. This case is about an emergency order entered to protect a child who was left in a locked car outside of an Arkansas mall for less than twenty minutes. The child, the parents, and the custodial grandparents all live in Oklahoma. No party is attempting to involve any other state court or custody order. The child's paternal grandparents have custody of the child by agreement of his parents. A home study and numerous letters from community members indicate that the grandparents are good, loving parents and that their home is more than adequate. The circuit court did not "place" the child with "foster parents," but simply ordered that custody of the child remain with his grandparents. We hold that the ICPC is not applicable to the particular facts of this case and that the circuit court's order granting custody to the child's grandparents without first receiving written authorization from the Oklahoma DHS was not clearly erroneous.

Finally, DHHS argues that the circuit court should have declined to issue any permanent orders in this case because Arkansas was not JTH's home state and, therefore, it did not have subject matter jurisdiction to do so under the Uniform Child Custody Jurisdiction and Enforcement Act, codified in Ark. Code Ann. § 9-19-101 (Repl. 2002) (the "Act"). DHHS cites *Murphy v. Danforth*, 323 Ark. 482, 915 S.W.2d 697 (1996), to support its argument that the circuit court's powers were limited and should not have been used to enter a permanent custody order. Jacob claims that the circuit court acted properly under its emergency jurisdiction authorized by Ark. Code Ann. § 9-19-204 (Repl. 2002).

Arkansas Code Annotated § 9-19-204(a) (Repl. 2002) states that "[a] court of this State has temporary emergency jurisdiction if the child is present in this State and the child has been abandoned or it is necessary in an emergency to protect the child because the child . . . is subjected to or threatened with mistreatment or

abuse." "[A] child-custody determination made under this section remains in effect until an order is obtained from a court of a State having jurisdiction" under the Act. Ark. Code Ann. § 9-19-204(b) (Repl. 2002). We agree with Jacob. The circuit court had authority under this statute to enter an order granting custody to the grandparents.

■ DHHS's reliance upon the supreme court's decision in *Murphy* is misplaced. In *Murphy*, the supreme court said that emergency jurisdiction should not be used "*to modify* a custody order permanently." 323 Ark. at 491, 915 S.W.2d at 700 (emphasis added). The circuit court in this case did not modify a custody order permanently. The court granted custody to the grandparents, who already had custody over JTH. Both parents agreed with the court's decision. If either of JTH's parents decides that he or she disagrees with this custody arrangement, either may pursue an action in an Oklahoma court for a change of custody. We hold that the circuit court did not clearly err in awarding custody to JTH's paternal grandparents under Ark. Code Ann. § 9-19-204 (Repl. 2002).

Affirmed.

GLADWIN and BAKER, JJ., agree.