2009 Ark. App. 771

**Brian BRODERICK, Appellant,**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES,**
**Appellee.**

**No. CA 09–351.**

Court of Appeals of Arkansas.

Nov. 18, 2009.

Orin Eddy Montgomery, Little Rock, and Clay S. Conrad, for appellant.

Tabitha Baertels McNulty, Office of Chief Counsel, Little Rock, Keith L. Chrestman, Jonesboro, for appellee.

ROBERT J. GLADWIN, Judge.

This appeal is one of three cases decided today that involve children who were taken into emergency custody by DHS from the Tony Alamo Christian Ministries compound in Fouke, Arkansas, in September 2008. Appellant Brian Broderick is the father of two girls, S.B. and A.B., taken into custody and challenges the circuit court's order adjudicating his daughters dependent-neglected. Judge Joe Griffin heard this case and the one concerning Alphonso Reid's daughters, A.R. and C.R., at the same hearing. Judge Jim Hudson heard the proceeding concerning Greg Seago's daughter, V.S. Many witnesses testified at both hearings, and some testimony was consolidated in all three cases. Where possible, we will refer to the evidence discussed at length in the Seago opinion in order to avoid repetition.

Broderick has been a member of the ministry for over twenty-five years. He works for and lives on property used by the ministry. Susan Broderick, the mother of S.B. and A.B., married Broderick in 1989 in the ministry when she was fifteen or sixteen. She left the ministry in early 2008 and is now living in Virginia with her fourteen-year-old daughter, M.B., and her adult son, Nicholas Broderick. Although Susan Broderick was involved in the adjudication proceeding, she has not appealed the adjudication order. The Brodericks' fif-

teen-year-old son lives with his father. S.B., who was born December 31, 1995, and A.B., who was born June 17, 1997, lived at Alamo's residence before they were taken into custody by DHS.

Spencer Ondrisek testified in this hearing and in the Seago hearing. As in the Seago case, he talked about the iron control held by Tony Alamo over the members of the ministry. In both hearings, he testified about being beaten by John Kolbeck when he was twelve; his second beating by Kolbeck in 2006, when his sister, A. O., was also beaten; and a third beating in October 2007. Spencer stated that parents must get permission from Alamo to take their children to the doctor, and that he never saw a parent try to prevent their child from being beaten. He explained that fear played a vital role in keeping everyone under control. He testified that the members of the church were taught that if they left, they would fall into sin; that they could not trust the government, which was the "anti-Christ"; and that they could not go to the government for help. Spencer said that his parents would not speak to him after he left the ministry.

M.B., who also testified at the Seago hearing, testified that she, S.B., A.B., A.R., V.S., B.S., A.T., and M.E. were underage females who lived at Alamo's house with the adult women who were known to be Alamo's wives. She said that D.K. moved into Alamo's house when she was eight, and that S.H. moved there when she was about ten. M.B. said that she saw both D.K. and S.H., who were known as his wives and had wedding rings, go into Alamo's bedroom and shut the door, staying there for hours. As in the Seago hearing, she described her sexual molestation and threats by Tony Alamo when she was in the shower. She said that she did not tell her parents about the molestation because they would not have believed her over Alamo. As in the Seago hearing, she described her beating by John Kolbeck when she was ten years old, and talked about being forced to participate in a recording with B.S., V.S., and A.R., wherein the underage girls denied having been molested by Alamo. M.B. also testified that she witnessed her sister S.B. being beaten by Michelle Jones, one of Alamo's wives, with a board, while M.B. was forced to help hold her sister down. Another time, she said, she observed Alamo catch B.S. by the throat and shove her against the wall. She also said that she heard B.S. being beaten by Kolbeck as she screamed that she wanted her mother.

Danny Ondrisek also testified in both hearings. He described his punishment on "diesel therapy" and said that the whole church was placed on a week-long fast when he was eight or nine years old. He stated that, after his sister Alice moved in with Alamo when she was ten or eleven, his family's status improved. His mother received a new Dodge Caravan; his father got an expensive digital camera; they moved into a very large house in Texarkana; and his parents obtained better jobs in the ministry. He stated, "It is common knowledge that if you move into Tony's house and you are spending a certain amount of years there you are one of his wives. I mean he definitely doesn't have boys coming over all the time. It's only little girls and they usually never move out."

Alanna Downs also testified in both hearings. She said that her sister Pebbles was one of Alamo's wives and described seeing several young girls go into Alamo's bedroom; she saw A.O. go into Alamo's room and stay for three or four days. She stated that Alamo talked about how beautiful Alice Ondrisek was and referred to her as his wife. As in the Seago hearing, she described her periods of imposed fasting

and her physical punishment. She described the beatings of other young girls, including A.O., and Kolbeck's beating of Danny and Spencer Ondrisek. She testified that, when they were tipped off about an upcoming raid, the younger girls who were Alamo's wives were sent out of Alamo's residence, and that she observed some pictures of his underage wives being removed from his belongings.

The videotaped depositions of Nicholas Broderick and Jessica Cooper, which were played in the Seago hearing, were also admitted in this hearing.

Antavia Reid, Alphonso Reid's stepdaughter, also testified about being beaten and forced to fast as punishment. She said that the primary reason why she left the ministry was because Alamo did not permit her to obtain medical attention for her son, who was born with a serious medical condition. Antavia testified that Alamo has multiple wives and that she witnessed J.G. and W.T. marry thirty-year-old men when J.G. was twelve and W.T. was thirteen. Antavia said that she had only completed the eighth grade.

Dr. Karen Worley's testimony in this hearing was significantly similar to her testimony in the Seago hearing. She said that the girls in this proceeding did not reveal any sexual abuse. She stated that C.R., A.B., and S.B. talked about how the government thought that Alamo was a pedophile and appeared to have been coached before their interviews with investigators.

Robbie Polite, with DHS, testified that, although S.B. and A.B. had received some immunizations, they were not up-to-date, according to the records in Arkansas.

S.B. testified that, since she was eleven years old, she and A.B. had primarily lived in Alamo's house. She described a spanking that Alamo ordered one of his wives, Michelle Jones, to give her:

After he got off the phone, Tony said he was going [to] have Michelle spank me and I begged him not to and he said, yes, he was going to, I needed to learn my lesson and he took me into his room and got the paddle from behind his desk and had all my friends and everybody in the office come into his room and said for all them to watch me. . . .

I was scared. I was crying. I asked him not to do this. We went into Tony's room and he had four people hold me, hold my arms and legs down and he told me to bend over on his bed and I believe it was, do I need to say the name? It was Lydia, Sharon Alamo, Yvonne. She is known as Pebbles. And I can't remember who else . . . but I got beat four times with the board. . . . He didn't know how many licks I was going to get. He . . . had a smile on his face and just watching me and he whispered something to Michelle and Michelle just gave me four. After it was done I said thank you. I said that because I believed that he was doing it because he loved me and that's what he said. . . .

I had marks on my thighs. They were big bruises and, you know, my blood vessels had broken inside my skin. They were blue, purple, and black. They hurt. I felt the pain for about three weeks. About the first week I couldn't sit down, but the second week after that I could. I did not report the pain because I was scared.

Tony has slapped me probably five times. I think, five. He slapped my face. Well one time it was because he said I was giving him a dirty look, and which I wasn't but. [sic] That caused me to question him being blind.

S.B. said that she did not tell her father about the spanking or that Alamo had slapped her.

Bernie Lazar Hoffman, aka Tony Alamo, testified that he did not have total control over the members of the church. He denied the allegations of sexual abuse. He affirmed his belief in the Bible's teachings that polygamy is acceptable and that girls can be married after they reach puberty. He denied, however, actually practicing polygamy, or condoning or permitting the marriage of underage girls. He said that he had not witnessed A.O.'s "spanking" by Kolbeck, but acknowledged that he had witnessed Spencer Ondrisek's "spanking." He called the reports of beatings "exaggerated." A significant amount of his testimony concerned his religious beliefs and was not relevant to the issues presented in this appeal.

Alphonso Reid denied having any knowledge of beatings, sexual abuse of young girls, underage marriages, or fasts. He admitted that he had permitted Tamela to live in Alamo's house since she was eleven or twelve; that A.R. and C.R. had also lived there; and that he had lived apart from the girls in Fouke. He said that when he was not traveling for work with the ministry, he lived in the brothers' dorm, and admitted being away from Fouke for months at a time. He acknowledged seeing J.G. with her husband, and that he knew about the recording Alamo had made with the girls, as well as the allegations of sexual abuse. He admitted asking Alamo for permission to marry Alanna Downs, but said that the marriage did not occur because she was underage and she did not want to marry him; he said that the idea "was from the devil." He said that he thought that Alamo was a prophet and did not believe that Alamo had sexually abused any girls.

Brian Broderick denied knowing that children had been beaten, sexually abused, slapped, or forced to fast, and described the ministry as a great environment in which to raise children. He did not believe any of the witnesses testifying to such abuse and called his children, M.B. and Nicholas, liars. In fact, he said that there was nothing anyone could do to make him believe that Alamo, whom he considered to be a prophet, had molested M.B. He acknowledged that he had been aware of the allegations of sexual abuse because he had heard the recording of Alamo and the girls and had attended some Fouke city council meetings. He admitted permitting his daughters to live at the mission, where Alamo resides, while he worked out of town for months at a time. He said that he has done construction work for the ministry most of his life, and that he is totally dependent upon it for all of his needs.

On January 6, 2009, Judge Griffin entered an order adjudicating S.B. and A.B. dependent-neglected for the same reasons that Judge Hudson gave in the Seago order. He found Spencer Ondrisek, Danny Ondrisek, Antavia Reid, M.B., Jessica Cooper, and S.B. credible. He found Broderick, Reid, and Tony Alamo not credible. He imposed the same requirements on Broderick as Judge Hudson did on Seago—that he obtain housing and employment outside of the ministry. The same day, Judge Griffin entered an order adjudicating A.R. and C.R. dependent-neglected for the same reasons, and imposing the same requirements on Reid. He made the same credibility findings.

Broderick challenges the sufficiency of the evidence supporting the adjudication order and attacks the credibility of the witnesses who said anything negative about the ministry. As Seago argued, he contends that there was no medical evi-

**914**

dence that the fasts were dangerous or that the children were injured. He disputes that the children were neglected medically or educationally. He also asserts, for the first time on appeal, that the trial court's requirement that he obtain employment and housing outside of the ministry is unconstitutional. We do not address arguments raised for the first time on appeal. *See Ark. Dep't of Health & Human Servs. v. Jones,* 97 Ark.App. 267, 248 S.W.3d 507 (2007).

■ Adjudication hearings are held to determine whether the allegations in a petition are substantiated by the proof. Ark. Code Ann. § 9–27–327(a)(1) (Supp.2009). Dependency-neglect allegations must be proven by a preponderance of the evidence. Ark.Code Ann. § 9–27–325(h)(2)(B) (Supp.2009). We will not reverse the circuit court's findings unless they are clearly erroneous. *Brewer v. Ark. Dep't of Human Servs.,* 71 Ark.App. 364, 43 S.W.3d 196 (2001). In reviewing a dependency-neglect adjudication, we defer to the circuit court's evaluation of the credibility of the witnesses. *Id.* The focus of an adjudication hearing is on the child, not the parent. At this stage of a proceeding, the juvenile code is concerned with whether *the child* is dependent-neglected. An adjudication of dependency-neglect occurs without reference to which parent committed the acts or omissions leading to the adjudication; the juvenile is simply dependent-neglected. *See Howell v. Ark. Dep't of Human Servs.,* 2009 Ark. App. 612, 2009 WL 3028987; *Albright v. Ark. Dep't of Human Servs.,* 97 Ark.App. 277, 248 S.W.3d 498 (2007).

■ Arkansas Code Annotated section 9–27–303(18)(A) (Supp.2009) defines a "dependent-neglected juvenile" as any juvenile who is at substantial risk of serious harm as a result of abandonment, abuse, sexual abuse, sexual exploitation, or ne-

glect. The definition of "neglect" in section 9–27–303(36)(A) includes acts or omissions of "a parent, guardian, custodian, foster parent, or any person, who is entrusted with the juvenile's care by a parent," that constitute:

(i) Failure or refusal to prevent the abuse of the juvenile when the person knows or has reasonable cause to know the juvenile is or has been abused;

(ii) Failure or refusal to provide the necessary food, clothing, shelter, and education required by law, ... or medical treatment necessary for the juvenile's well-being ...;

(iii) Failure to take reasonable action to protect the juvenile from abandonment, abuse, sexual abuse, sexual exploitation, neglect, or parental unfitness when the existence of this condition was known or should have been known;

(iv) Failure or irremediable inability to provide for the essential and necessary physical, mental, or emotional needs of the juvenile, including failure to provide a shelter that does not pose a risk to the health or safety of the juvenile;

(v) Failure to provide for the juvenile's care and maintenance, proper or necessary support, or medical, surgical, or other necessary care;

(vi) Failure, although able, to assume responsibility for the care and custody of the juvenile or to participate in a plan to assume the responsibility; or

(vii) Failure to appropriately supervise the juvenile that results in the juvenile's being left alone at an inappropriate age or in inappropriate circumstances, creating a dangerous situation or a situation that puts the juvenile at risk of harm.

The evidence introduced at this hearing presented a clear picture of the danger to children in the ministry compound at Fouke. There was testimony that many children were beaten, including M.B., S.B., and their brother; Antavia Reid; and C.R.

Several were placed on fasts. Spencer Ondrisek was given "diesel therapy" and his brother Danny was imprisoned in a warehouse for eight months. Alamo slapped S.B. and shoved B.S. against a wall. There was evidence that Alamo molested M.B., and that he "married" several young girls. There was testimony that it was normal for underage girls to be married to much-older men. In spite of the evidence demonstrating that sexual abuse of underage girls, beatings, and fasts were widely known within the ministry, Broderick denied knowing of any potential danger to his children. The evidence presented at this hearing sufficiently demonstrated that the environment in which Broderick placed his children was dangerous. Given the juvenile code's goal of preventing the abuse of children before it occurs, if at all possible, we have no hesitation in affirming the circuit court's finding that these children were dependent-neglected.

Affirmed.

VAUGHT, C.J., and MARSHALL, J., agree.