2013 Ark. App. 267

**Mike WILSON and Jeanean Wilson, Appellants**

v.

**Mark GOLEN and Jessica Golen et al., Appellees.**

**No. CA 12–668.**

Court of Appeals of Arkansas.

April 24, 2013.

---

Ballard & Ballard, P.A., Little Rock, by: Andrew D. Ballard, for appellants.

R. Allen Waters, III, for appellees.

ROBIN F. WYNNE, Judge.

Mike and Jeanean Wilson appeal from the circuit court's order granting appellees' petition for adoption of B.W. and denying their adoption petition. Mike Wilson is the paternal grandfather of B.W., and the appellees, Mark and Jessica Golen, were B.W.'s foster parents. On appeal, appellants argue that the trial court (1) lacked jurisdiction to grant appellees' petition because appellees did not strictly comply with the home-study requirement of Arkansas Code Annotated section 9–9–212 and (2) clearly erred in its best-interest determination. We affirm.

B.W. was born out of wedlock to Laura Stevens and Brock Wilson on January 24, 2011. After B.W.'s meconium tested positive for marijuana, B.W. was taken into emergency custody by the Arkansas Department of Human Services (DHS) on January 29. He was placed in foster care with appellees, who had adopted B.W.'s half-brother (Laura's son), A.G., in October 2010.

In October 2011, appellants filed a motion to intervene in the dependency-neglect case. They began having overnight visitation with B.W. in December 2011. After DHS filed a petition to terminate parental rights in January 2012, appellants and appellees filed petitions for adoption of B.W. In addition, appellees filed a motion seeking to use the home study that was done in connection with their adoption of B.W.'s brother as their required home study in the present case.

The court held a hearing on the competing petitions for adoption on March 27, 2012.[1] The family-services worker assigned to B.W.'s case testified that DHS was recommending that B.W. be adopted. She testified that DHS recommended granting appellants' petition for adoption, noting their approved home study and DHS's policy favoring relative placement. She also stated that she could say nothing negative about appellees' care of B.W.— they had done an "excellent job." The caseworker also testified that B.W.'s biological father had refused to give her information regarding his father because he did not want B.W. placed with appellants. In August, she met appellant (Mike Wilson)

---

1. That day, B.W.'s parents signed consents to termination of parental rights. The order ter-

minating parental rights was entered on May 14, 2012.

when he came to her office to ask about the case.

Mike Wilson testified that he found out in June that his son's girlfriend had had a baby and that the baby was in foster care. He stated that from June until August 17, he was attempting to find the right person at DHS to contact about obtaining custody of B.W. Mike testified that he and his son were estranged. He testified regarding his frustration at dealing with DHS, from getting in touch with the right person to getting his home approved so that overnight visitation could begin. The Wilsons' home was approved, and Mike testified to the close relationship he and his wife had developed with B.W. since they began keeping him in their home in December 2011, when he was eleven months old. He stated that if they were allowed to adopt B.W., his wife would stop working to care for B.W. full time. He testified that his work schedule was flexible enough that he could spend a lot of time with B.W. Mike testified that he was fifty-nine years old and in excellent health, with a family history of longevity. He stated that he had sufficient income to support B.W., and the home study listed Mike's annual income as $390,000. As for spiritual training, Mike testified that he and his wife were members of Faith Baptist Church and would raise B.W. in a Christian home. He further testified that he and his wife had a stable relationship and had been married for about twenty years. On cross-examination, Mike admitted that he had heard that his son's girlfriend was pregnant prior to B.W.'s birth in January 2011, but stated that he did not "know for a fact" that she was pregnant.

Jeanean Wilson testified that she would quit working to stay home with B.W. if she and her husband's adoption petition were granted. She stated that her husband had adopted her young daughter from a previous marriage (Laura Wilson) and was of meaningful assistance to her in raising Laura. She testified that she was fifty-one years old and had high blood pressure. Jeanean stated that she was taking medication for her blood pressure and was otherwise healthy. She testified regarding her involvement in her daughter's life (being room mother, etc.) and her desire to do those same things for B.W.

Michael Wilson (Mike's son) and Laura Wilson testified on appellants' behalf.

Jessica Golen testified that she and her husband, Mark, had been married since 1999. They had lived at the same address in Greenbrier since 2001; they lived in a two-bedroom, two-bathroom trailer on about ten acres. She testified that Mark was a good husband and father. They regularly attended their Pentecostal church. Jessica testified that she was currently pregnant and would be a stay-at-home mother after the baby was born. She testified that they would be able to pay their expenses without her income. Jessica stated that B.W. and his half-brother A.G. loved each other and loved playing together; B.W. called her husband "Da-da" and called her "Momma." She also testified that Mike Wilson had admitted to her that he knew Laura was pregnant before B.W. was born.[2] Jessica testified that the only changes since the home study conducted for A.G.'s adoption in late 2010 were that her husband was making more money and that they had purchased another vehicle.

Mark Golen testified that he works in the oil field treating "frac" water. He stated that he was currently being paid $20 an hour, but would soon be on salary making $9,000–$10,000 a month.

---

2. Mike testified that this was not true.

Beverley Gray, Jessica Golen's cousin, testified for appellees that they were good, loving parents.

On April 10, 2012, the court announced its decision to grant appellees' petition. The court found that several factors in determining B.W.'s best interests were a "wash"—love for the child, spiritual raising, and being with biological relatives (grandfather and extended family vs. half-sibling). As for financial security, the court found that while appellants had more money, appellees were also able to provide for B.W. The court looked at the amount of time that appellees had spent with B.W. since his birth and the fact that he was with his |5 half-brother there, and the court determined that it was in the child's best interest to grant appellees' petition. The adoption decree was entered on May 16, 2012, and it cited appellees' home study dated October 13, 2010, as supplemented by appellees' testimony. This appeal followed.

I. *Home Study*

[redacted] First, appellants contend that the appellees' failure to file a home study for the adoption of B.W. deprived the circuit court of jurisdiction. They contend that the plain language of the statute requires that "a home study must be filed with the Court prior to [the] petition being heard, and that it must contain an evaluation of the anticipated or expected adoption, not for any adoption which occurred years before."

[redacted] Arkansas Code Annotated section 9–9–212 (Supp.2011) requires that a home study be done before a child is placed in the home of a party petitioning for adoption and provides in part:

> (b)(1)(A) Before placement of the child in the home of the petitioner, a home study shall be conducted by any child welfare agency licensed under the Child Welfare Agency Licensing Act, § 9–28–401 et seq., or any licensed certified social worker.
>
> . . . .
>
> (3) All home studies shall be prepared and submitted in conformity with the regulations promulgated pursuant to the Child Welfare Agency Licensing Act, § 9–28–401 et seq.
>
> (4)(A) The home study shall address whether the adoptive home is a suitable home and shall include a recommendation as to the approval of the petitioner as an adoptive parent.
>
> (B) A written report of the home study shall be filed with the court before the petition is heard.
>
> (C) The home study shall contain an evaluation of the prospective adoption with a |6 recommendation as to the granting of the petition for adoption and any other information the court requires regarding the petitioner or minor.
>
> (5)(A) The home study shall include a state-of-residence criminal background check, if available, and national fingerprint-based criminal background check performed by the Federal Bureau of Investigation in compliance with federal law and regulation on the adoptive parents and all household members eighteen (18) years of age and older, excluding children in foster care.

First, we note that appellees' home study was admitted without objection. Appellants did not raise their current argument below, and it was not considered by the trial court. An appellant may not change the basis for his or her arguments or raise issues for the first time on appeal. *Carr v. Millar,* 86 Ark.App. 292, 296, 184 S.W.3d 470, 473 (2004).

[redacted] Appellants assert that the failure to file a home study for the adoption of B.W.

is jurisdictional and requires reversal. Our supreme court has stated:

> It is well settled that subject-matter jurisdiction is a court's authority to hear and decide a particular type of case. A court lacks subject-matter jurisdiction if it cannot hear a matter "under any circumstances" and is "wholly incompetent to grant the relief sought." A court obtains subject-matter jurisdiction under the Arkansas Constitution or by means of constitutionally authorized statutes or court rules.... [S]ince amendment 80 was adopted, circuit courts have original jurisdiction of "all justiciable matters not otherwise assigned pursuant to" the constitution.

*Edwards v. Edwards,* 2009 Ark. 580, at 3–4, 357 S.W.3d 445, 448 (internal citations omitted). A court may act contrary to a statute or in conflict with this court's case law but do so within its subject-matter jurisdiction. *Id.* Under Arkansas Code Annotated section 28–1–104(5), the circuit court "shall have jurisdiction over [t]he determination of heirship or of adoption." Thus, the circuit court had jurisdiction to determine B.W.'s adoption, and any error in relying on appellees' home study was required to be raised to the circuit court. *See Ark. Dep't of Health & Human Servs. v. Jones,* 97 Ark.App. 267, 248 S.W.3d 507 (2007) (refusing to consider argument raised by Department of Health and Human Services for the first time on appeal from trial court's order granting permanent custody of child to his paternal grandparents, that home study was insufficient because it was conducted by a licensed social worker, rather than a licensed, certified social worker, as required by statute). We affirm on this point without reaching the merits of appellants' argument because it is not preserved for appellate review.

## II.  *Best Interest*

■  Next, appellants argue that the trial court's determination that it was in B.W.'s best interest to be adopted by appellees was clearly erroneous. They contend that the court's findings that the following factors were a "wash" were clearly wrong: love, care, and nurture; spiritual guidance; and financial positions. They also disagree with the court's findings that the "biological relatives" factor was a wash or went in favor of appellees and the determinative factor—time spent with the child already—went in favor of appellees. Finally, they point to Arkansas Code Annotated section 9–9–102(a) (Supp.2011), which provides that

> [i]n all custodial placements by the Department of Human Services in foster care or adoption, the court shall give preferential consideration to an adult relative over a nonrelated caregiver, provided that the relative caregiver meets all relevant child protection standards and it is in the best interest of the child to be placed with the relative caregiver.

■  The burden rests on the one seeking adoption to prove by clear and convincing evidence that adoption is in the child's best interest. *Luebker v. Ark. Dep't of Human Servs.,* 93 Ark.App. 173, 217 S.W.3d 172 (2005). The ultimate determination of best interest is the primary objective of the trial court in custody matters. *Id.* We defer to the trial court's personal observations when the welfare of a young child is involved because we know of no other case in which the superior position, ability, and opportunity of the trial court to observe the parties carries as great a weight as one involving minor children. *Id.* On appeal, we review the evidence de novo, but we will not reverse a trial court's findings unless it is shown that they are clearly contrary to the preponderance of the evidence. *Id.*

In this case, the trial court was faced with choosing between two suitable adoptive homes for B.W. Keeping in mind the standard of review, we affirm the circuit court's best-interest finding because it was not clearly contrary to the preponderance of the evidence.

Affirmed.

HIXSON and WOOD, JJ., agree.