Cite as 2020 Ark. App. 543

# ARKANSAS COURT OF APPEALS
## DIVISIONS I, II & III
### No. CV-19-894

DARIN FRENCH

APPELLANT

V.

KENNETH HOELZEMAN

APPELLEE

**Opinion Delivered** December 2, 2020

APPEAL FROM THE CONWAY
COUNTY CIRCUIT COURT
[NO. 15PR-18-111]

HONORABLE DAVID H.
MCCORMICK, JUDGE

REVERSED AND DISMISSED

## BRANDON J. HARRISON, Judge

Darin French, the undisputed biological father of BF, SF1, DF, and SF2, did not provide financial support or communicate with his children for more than one year since he and his former wife, Jennifer Hoelzeman, were divorced in California in 2012. But were these failures legally justified given the circumstances? That is the question before us. Having reviewed the record and the law, we hold that they were justified. Consequently, we reverse the circuit court's decision to grant Kenneth Hoelzeman's petition to adopt and dismiss it.

## I. *Discussion*

We review adoption proceedings de novo, and the circuit court's decision will not be set aside unless it is clearly erroneous. *Martini v. Price*, 2016 Ark. 472, at 4, 507 S.W.3d 486, 489. A finding is clearly erroneous when, despite evidence to support it, we are left

with the firm conviction that a mistake has been committed. *Id.* Due regard is given to the circuit court's superior position to judge any witness's credibility. *Id.*

The general rule is that a petition may be granted only if written consent to the adoption has been procured from the child's biological parents by the petitioner. *See* Ark. Code Ann. § 9-9-206 (Repl. 2015); *In re Adoption of Parsons*, 302 Ark. 427, 791 S.W.2d 681 (1990). There are some exceptions. One is that a parent's consent is not required when a petitioner who seeks to adopt another's biological child alleges, and the circuit court finds by clear and convincing evidence, that the parent

> for a period of at least one (1) year has failed significantly without justifiable cause (i) to communicate with the child or (ii) to provide for the care and support of the child as required by law or judicial decree[.]

Ark. Code Ann. § 9-9-207(a)(2) (Repl. 2015).

This appeal turns on that section.

"Failed significantly" does not mean "failed totally." *In re Adoption of T.A.D.*, 2019 Ark. App. 510, at 6, 588 S.W.3d 858, 862. If the petitioner meets the initial burden, then the nonconsenting parent(s) must show some justifiable reason for the failures. *Holloway v. Carter*, 2019 Ark. App. 330, at 3, 579 S.W.3d 188, 190. The ultimate burden of proof, however, remains with the petitioner—here that is Kenneth Hoelzeman—who must ultimately persuade the court that Darin's reasons for a lack of contact and support are not legally justified.

On this facet, our supreme court has written that a failure to communicate without justifiable cause is one that is voluntary, willful, arbitrary, and without adequate excuse. *In re Adoption of Lybrand*, 329 Ark. 163, 169–70, 946 S.W.2d 946, 950 (1997). When faced

2

with having to decide whether a parent has presented justifiable cause, courts must assess and weigh the parent's reasons why he or she failed to communicate or support one or more children. *See Newkirk v. Hankins*, 2016 Ark. App. 186, at 10, 486 S.W.3d 827, 833 (A court "must inquire whether the parent has utilized those resources at his or her command . . . in continuing a close relationship with the child.") (citing *Zgleszewski v. Zgleszewski*, 260 Ark. 629, 632, 542 S.W.2d 765, 768 (1976)).

A. Justified Failure to Communicate

In July 2018, Kenneth filed a petition to adopt BF, SF1, DF, and SF2, with the consent of their biological mother, Jennifer Lynn Hoelzeman. Two children, BF and SF1, who are older than 12, said that they wanted Kenneth to adopt them. The petition did not allege that Darin's consent was not required under Ark. Code Ann. § 9-9-207(a)(2)(i). Instead, the petition alleged that Darin was in a federal prison, that he had provided no care and support to the minor children for the past three years, and that he had not contacted them for just as long.

The children's biological father, Darin, filed pro se objections to the petition. He admitted that he is the father of BF, SF1, DF, and SF2, and that he was married to their mother (Jennifer) when they were born. He also responded that the parties were divorced in California and that a California divorce decree allowed him to call the children, to write them, and to have them visit him in prison. But Jennifer had "abducted and/or carried away the children, hiding the whereabouts and has obstructed any and all attempts to have contact" with them.

Darin admitted in his pro se response that he had been incarcerated since 2009. And he pointed out that the California divorce judgment did not impose any support obligation on him. Attached to his pro se response was a 2013 Lassen County, California, court decree ordering that the children's last name be changed from Lynn (Jennifer's maiden name) to French (Darin's last name). Further, attached as separate exhibits to Darin's pro se response, were the following:

- an affidavit by him detailing the efforts he had made to contact his children during his incarceration;

- a statement by his mother (the children's paternal grandmother) reciting her efforts to find and communicate with the children; and

- a statement by Darin's parents that they wanted visitation, phone calls, and other opportunities to engage their granddaughters.[1]

Shortly after Darin responded to the petition, he engaged counsel to represent him.

The circuit court convened a hearing on Kenneth's petition in July 2019. Approximately one week before the hearing convened and after having worked behind the scenes for some time, Darin's counsel moved to continue the hearing because counsel had been unable to secure Darin's transportation from a federal prison in Texas to the hearing in Conway County, Arkansas. Darin's motion alleged that for several weeks, his lawyer had tried to contact legal counsel for the prison and the United States Attorney for the Eastern District of Texas to learn how this could be done and that she had received an email the day before that all transfers must be cleared through regional counsel and the prison warden.

_____

[1]The dissent implies that we used a motion as substantive evidence. We have not; all we have done is tell the history of the case as it was filed, developed, and presented to the court on paper and through testimony.

Counsel had apparently learned that to secure Darin's appearance, the circuit court would have had to issue a "Writ of Habeas Corpus Ad Testificandum"; then other agencies would have had to approve the transfer.

At the start of the consent hearing, Darin's counsel proffered testimony from paralegal Josh Gonzalez, who detailed calls he had made and emails he had sent to the federal prison since April 2019 with no response. Josh said that he had called nearly every day in June, for example. For reasons that we will not delve deeply into here, the court denied the continuance request; and it rejected counsel's request to allow Darin to appear by telephone during the hearing.

Speaking of absent witnesses, the record seems to indicate that Darin's parents (the children's paternal grandparents) tried to intervene in this case; but there is no order either denying or granting the intervention. The record more clearly shows that Darin's attorney told the court that Darin's mother "would love to come in by telephone. Once again, she's available." The court confirmed that the children's grandmother was currently in California then denied her request for a telephonic appearance. The stated reason: "Grandparents are derivative of the parent . . . [s]o that request will be denied here." Darin's attorney explained that Darin's parents were "going to have to intervene in the California case in the divorce. . . . And if the [circuit] Court should deny the adoption, they can intervene in the California case or the case can be moved here."

The legal irony is that the court, having disallowed the grandparents' participation, later held against Darin what the grandparents may or may not have known about Jennifer's whereabouts. The dissent sees Jennifer's words about what the grandparents did or did not

5

do, what they supposedly did or did not know, as a key to affirming the circuit court's decision. But neither the circuit court nor this one has ever learned firsthand what the grandparents knew or did not know. That uncertainty includes whether they passed any knowledge of the children's whereabouts to Darin in some manner. The uncertainty was caused by the court's decision to deny Darin's request to participate by telephone and the court's decision to deny the children's grandparents an opportunity to speak.

But Kenneth was permitted to testify, as were the children and Jennifer. When Jennifer testified, she said that that she moved to Morrilton, Arkansas, with the girls in April 2014 while on pretrial release—with federal mail and wire-fraud charges pending. (According to Jennifer's testimony, in August 2014, a federal court sitting in Reno, Nevada sentenced her to five years' probation and ordered her to pay $200,000 in restitution.) She said that Darin's parents attended her federal sentencing hearing when it was held in Nevada. Jennifer told the circuit court in this case that she informed the federal judge that she was living in Arkansas with her children and showed a video of the four girls. According to Jennifer, "everybody knew" that she was in Arkansas and that her supervision had been transferred to Arkansas. But the "everybody" referred to was not permitted to appear and testify, whether in person or by telephone.

Jennifer admitted that she received a FedEx envelope from Darin's mother in 2016. Inside was a request that the girls write to their great-grandmother. Jennifer said that she and the girls did not respond. She agreed, when asked, that she did not "ever get anything at all, cards or letters or packages from Darin French." Jennifer also said that Darin had sent no money and had not contacted the girls for the last three years. She did not say that he

6

knew where to send money or anything else (like gifts, etc.). Nor did she state that anyone knew her telephone number as she moved about the country.

On cross-examination, Jennifer said that she had cut off contact with Darin "the day that [she] was convicted," which was in 2011. The reason: her children "did not want to take any phone calls from him. They would cry." She said that Darin would yell at them.

Jennifer said that she stopped answering any calls from Darin in August 2011 and that she never notified him of her new address after she moved out of a rental property that his parents owned in Susanville, California. That move occurred in 2011.

Nor did Jennifer, according to her own words, notify Darin of the address where she had lived for six months in Arizona or that she had lived in San Antonio for a time. Jennifer also said that she never told Darin that she had married a man named Kenneth Hoelzeman or that her children were living with him. And she said that she stopped using the last name "French" for the children and had used the first name Joy, instead of Dariana, for one of the girls who had been named after Darin.

After hearing the evidence on the issues of communication and support, which more or less came from Jennifer alone, the circuit court stated in its written order that Darin "had the ability to find and contact his children if he wished to do so"; therefore, his consent was not required given that more than one year had passed since he last communicated with the children.

Darin appeals that decision.

To support the circuit court's decision below, Kenneth argues that Darin's parents—who did not testify—knew where Jennifer and the girls resided since August 2014 and had

7

a specific address in April 2016. Consequently, Darin's consent was unnecessary. Kenneth says that "Darin knew where his children were" because Darin's parents were present in the Nevada courtroom when Jennifer told the federal judge during her sentencing hearing that she and the children were living in Arkansas. According to Kenneth, Jennifer was supervised while on probation; therefore, she could not "hide out." Kenneth's main point is that because Darin's parents were able to get the children's contact information and send the (unanswered) FedEx package in 2016, more effort from Darin would not have been futile.

Darin contends that Kenneth did not present clear and convincing evidence to support the circuit court's decision that Darin voluntarily, willfully, and without adequate excuse failed to communicate with his children. This is so, Darin says, because there was insufficient proof that he knew where his children were located—or even what their last name was—given the mother's conduct. Therefore, Kenneth failed to prove that Darin's failure to communicate with the children for more than one year was inexcusable.

We hold that the court's decision that Darin's consent was not required is clearly erroneous given the circumstances presented. From 2011 through 2016, Jennifer purposely concealed from Darin the location of the children's residences in Texas, Arizona, and Arkansas. Three states. Five years. Not only did Jennifer conceal the children's physical whereabouts, she candidly stated that she eliminated Darin's ability to contact the children by telephone: she "cut off contact with him," as she herself put it. Jennifer also changed her last name, and the children's last names, to "Lynn" and later to "Hoelzeman." Jennifer's behavior thwarted any efforts by Darin (who has remained in the same location for years) to locate his children and communicate with them in some appropriate and meaningful way.

8

The only evidence that Darin had "the ability to find and contact his children" was, arguably, in 2016, when Jennifer provided her address to an attorney friend of Darin's parents. The address was not provided to Darin. Yet, even the "attorney friend" angle proved futile. When the paternal grandparents wrote to the children with the new information at hand, they received no response. This raises an important question: does providing an address to a friend in California, who was a friend of the paternal grandparents, act as a sufficient legal ground on which to base a decision that Darin had an ability to find and contact his children? The dissent says yes. We respectfully disagree.

This case is grounded in an admittedly calculated and prolonged concealment of one parent's children by the other parent. Although there are some important factual differences between this case and *In re Adoption of Baby B.*, 2012 Ark. 92, 394 S.W.3d 837, that case instructs on the general principle that one parent who conceals a child from the other parent should not be rewarded for the effort. There is nothing controversial about this common-sense point.

Having applied the clearly erroneous standard of review, we hold that Jennifer's sequestration of BF, SF1, DF, and SF2's whereabouts from Darin provides a legal justification for Darin's failure to communicate meaningfully with them. The circuit court's contrary decision is therefore reversed.

### B. Justified Failure to Provide Support

For a parent to protect himself or herself from having the adoption laws used against them, must he or she provide financial support to a minor child although a relevant child-custody/support order expressly declares that no support is owed? Kenneth thinks so.

9

Citing *McGee v. McGee*, 100 Ark. App. 1, 262 S.W.3d 622 (2007), he argues that "regardless of whether it is court ordered, there is a continuing obligation requiring a parent to support his or her minor child. It's a legal and moral duty." Because Darin failed to send any money from prison, Kenneth says, his consent to the adoption was not legally required. For his part, Darin argues that the circuit court clearly erred in imputing income to him and, more importantly, he had a judgment from a California court declaring that he did not have to pay child support.

A certified copy of the California divorce/custody judgment was entered as evidence. In it, a California court decided that Darin had no child-support obligation. Section 4.m. of the judgment addresses support, and it is reproduced below.

4. (Cont'd.)
   i. ☐ A settlement agreement between the parties is attached.
   j. ☐ A written stipulation for judgment between the parties is attached.
   k. ☑ The children of this marriage or domestic partnership.
      (1) ☑ The children of this marriage or domestic partnership are:
          Name                                    Birthdate
          see attachment 4.k.(1)
      (2) ☐ Parentage is established for children of this relationship born prior to the marriage or domestic partnership.

   l. ☑ Child custody and visitation are ordered as set forth in the attached
      (1) ☐ settlement agreement, stipulation for judgment, or other written agreement.
      (2) ☐ Child Custody and Visitation Order Attachment (form FL-341).
      (3) ☐ Stipulation and Order for Custody and/or Visitation of Children (form FL-355).
      (4) ☑ other (specify): Sole legal and physical custody to Petitioner

   m. ☐ Child support is ordered as set forth in the attached
      (1) ☐ settlement agreement, stipulation for judgment, or other written agreement.
      (2) ☐ Child Support Information and Order Attachment (form FL-342).
      (3) ☐ Stipulation to Establish or Modify Child Support and Order (form FL-350).
      (4) ☐ other (specify):

   n. ☐ Spousal or partner support is ordered as set forth in the attached
      (1) ☐ settlement agreement, stipulation for judgment, or other written agreement.
      (2) ☐ Spousal, Partner, or Family Support Order Attachment (form FL-343).
      (3) ☐ other (specify):
      NOTICE: It is the goal of this state that each party will make reasonable good faith efforts to become self-supporting as provided for in Family Code section 4320. The failure to make reasonable good faith efforts may be one of the factors considered by the court as a basis for modifying or terminating spousal or partner support.

   o. ☑ Property division is ordered as set forth in the attached
      (1) ☐ settlement agreement, stipulation for judgment, or other written agreement.
      (2) ☐ Property Order Attachment to Judgment (form FL-345).
      (3) ☑ other (specify): see attachment 4.o.(3)

   p. ☐ Other (specify):

The parties' lawyers attempted to discover whether and when Darin may have had money available to him in his prison commissary account, but no one so much as suggested an amount, much less proved with any certainty how much money was or was not available to Darin and when. Whatever may be said of the discovery dispute, its importance is diminished by the judgment that relieved Darin of any support obligation. That Darin and Jennifer were divorced by a California court in which child support was not awarded is significant in this case.

The California judgment is the governing instrument on the issue of support. No party has argued that it should not be given full force and effect in Arkansas. This is not surprising for two reasons. First, a divorce/custody/support decree is the usual instrument through which a court in Arkansas decides such issues. Second, child-support orders issued in another state may be registered in Arkansas. Ark. Code Ann. § 9-17-601 (Repl. 2015).

The statute at issue on the child-support question in this case, section 9-9-207(a)(2)(ii), states that a parent has a duty "to provide for the care and support of the child as required by law or judicial decree." Some eight years ago, a California court did not order Darin to pay child support. But the effect of that judgment in this case must be considered under Arkansas case law that has addressed section 207(a)(2)(ii).

*In re Adoption of Glover*, 288 Ark. 59, 702 S.W.2d 12 (1986), is a case in which our supreme court held that a noncustodial parent who had no court-ordered child-support obligations does not have any "duty" to provide beyond what was imposed by the court order. In other words, although the noncustodial parent had not paid any child support,

11

her consent was still required before the child could be adopted. *Id*. *Glover*'s holding runs counter to the circuit court's decision in this case.

In addition to *Glover*, there is this court's case of *Neel v. Harrison*, 93 Ark. App. 424, 220 S.W.3d 251 (2005). *Neel* held that section 9-9-207(a)(2)(ii) cannot be used against a parent when a court order has relieved a parent from providing child support.

A stepparent-adoption case involving an incarcerated parent decided by the supreme court after *Glover* and *Neel* is not to the contrary. *In re Adoption of A.M.C.*, 368 Ark. 369, 246 S.W.3d 426 (2007), affirmed a circuit court decision that an imprisoned father's consent to adopt was not required. The father had failed to pay child support for nineteen months and was incarcerated for twelve of those months. Although the supreme court agreed that the father's consent was not required, there is an important distinction between *A.M.C.* and this case. The difference is that the father in *A.M.C.* had been *ordered to pay* child support in the parties' divorce decree. "The decree also incorporated a settlement agreement providing that Lois be the primary physical custodian of A.M.C. and that Paul pay child support to Lois in the amount of $80 per week[.]" 368 Ark. at 371, 246 S.W.3d at 428.

*A.M.C.* is therefore entirely consistent with *Glover* and *Neel*: if a parent is under an existing court order to pay child support while imprisoned, then imprisonment does not relieve the parent of the court-ordered responsibility. On the other hand, if a court has expressly relieved a parent of the obligation to pay child support in an order, which is the case with Darin, then the nonpayment of support cannot be used against the parent in a subsequent adoption proceeding. The rule makes sense and is even handed. If child support was required under the adoption laws even though a parent has been relieved of the

12

obligation by a court order that results from a divorce and custody proceeding, how much support would be enough?  Which parent makes that determination?  How often should it be offered by one parent to the other?  And what if, as in this case, one parent goes dark for years and thereby renders it at best difficult, at worst practically impossible, for the hindered parent to send support?

In this case, a California judgment did not obligate Darin to pay child support.  And no proof establishes that Jennifer availed herself of a court system to seek support from Darin in the years after the California judgment was entered in 2012.  Further, there was a years-long concealment (at times active, at times passive) of the children's whereabouts from Darin as Jennifer moved about the country.  Jennifer never sent to Darin the children's address or some other contact information.  On this record, the facts and the law support Darin's position that his nonpayment of support was legally justified.  Therefore, the circuit court's finding that Darin's consent to adopt was not required because he had failed to support his children without justification was clearly erroneous.

## II.  *Conclusion*

The circuit court's decision to grant the petition to adopt is reversed and the petition dismissed.

Reversed and dismissed.

ABRAMSON, GLADWIN, HIXSON, and BROWN, JJ., agree.

KLAPPENBACH, SWITZER, WHITEAKER, and VAUGHT, JJ., dissent.

**N. MARK KLAPPENBACH, Judge, dissenting**.  I dissent.  I would affirm the circuit court's order finding that the consent of the biological father, Darin French, was not

13

required because for a period of at least one year he failed significantly without justifiable cause to communicate with his children. *See* Ark. Code Ann. § 9-9-207(a)(2) (Repl. 2015). Although the evidence does not prove that Darin knew where Jennifer and the children were living, there is no evidence that Darin made any attempt to locate or contact them for more than four years preceding the filing of the adoption petition. I would hold that such a prolonged and total failure is not justifiable.

In *Racine v. Nelson*, 2011 Ark. 50, 378 S.W.3d 93, the child's mother moved from Virginia to Arkansas without telling the father. The circuit court found that the father had made no good-faith effort to locate the mother or child from the date of the move until more than a year later. On appeal, our supreme court affirmed the circuit court's order that found the father had failed without justifiable cause to communicate with the child.

Likewise, here, there is no proof that Darin made a good-faith effort to locate the children. No witnesses testified on Darin's behalf regarding any attempts to communicate with the children. I would hold that the circuit court did not abuse its discretion in denying Darin's motion to continue the case that had been pending for a year. Darin did not obtain a ruling on a request to have the grandmother testify by telephone. The ruling cited by the majority noting that "[g]randparents are derivative of the parent" was the ruling denying intervention by the grandparents for the reason argued by Kenneth's attorney. Darin's attorney agreed that intervention was "not appropriate." Furthermore, any efforts to contact his children that Darin alleged to have made in his exhibits attached to his pro so objections to the adoption petition were not introduced into evidence. Exhibits to a pleading are not

14

evidence and must be introduced at trial in order to be considered. *Morrison v. Carruth*, 2015 Ark. App. 224, 459 S.W.3d 317.

Accordingly, the proof adduced at the hearing showed that the last attempt at communication came in 2013. Jennifer admitted refusing letters from Darin mailed to her, not to the children, because she thought they would be threatening. Darin introduced into evidence three envelopes postmarked in 2013 that were addressed to Jennifer and marked return to sender. Jennifer admittedly stopped answering Darin's phone calls in 2011, but she was still in contact with his parents at this time. Darin's parents attended Jennifer's 2014 sentencing hearing. In 2016, Jennifer responded to a request to contact an attorney that she knew to be a family friend of Darin's parents, even though she believed that Darin was in contact with his parents. Jennifer testified that she left her name, phone number, address, and email address with the attorney's secretary. These are not the actions of someone committed to a "calculated and prolonged concealment" of her children as alleged by the majority. The fact that Jennifer did not inform Darin of her move to Arkansas is not determinative. *See Racine*, *supra*.

For the years 2014, 2015, 2016, 2017, and 2018, there is no evidence that Darin made any attempt to obtain contact information for the children whether through the internet, an attorney, or his mother. Darin was aware of the name changes, and the fact that his mother was able to obtain their contact information shows that such efforts would not have been futile. *See Zgleszewski v. Zgleszewski*, 260 Ark. 629, 542 S.W.2d 765 (1976) (noting that an imprisoned father could have asked his relatives about the whereabouts of his children). I would hold that Darin's total failure to communicate was without justifiable

15

cause due to the lack of proof of a single attempt to contact his children for more than four years.

SWITZER, WHITEAKER, and VAUGHT, JJ., join.

*Owings Law Firm*, by: *Steven A. Owings* and *Tammy B. Gattis*, for appellant.

*Gordon & Caruth, PLC*, by: *Jeannie L. Denniston*, for appellee.