Cite as 2021 Ark. App. 486

# ARKANSAS COURT OF APPEALS
DIVISION IV
**No.** CV-20-697

| | |
|---|---|
| LAYMAN J. HUGHES<br><br>APPELLANT<br><br>V.<br><br><br>JONATHAN ELLIOTT AND<br>ROXANN ELLIOTT<br><br>APPELLEES | OPINION DELIVERED DECEMBER 8, 2021<br><br>APPEAL FROM THE POLK<br>COUNTY CIRCUIT COURT<br>[NO. 57PR-19-75]<br><br><br>HONORABLE JERRY RYAN,<br>JUDGE<br><br>REVERSED AND DISMISSED |

**ROBERT J. GLADWIN, Judge**

Layman Hughes appeals the May 6, 2020 final order and decree of adoption entered by the Polk County Circuit Court granting the petition for adoption of his four children filed by Jonathan Elliott and Lisa Elliott (husband and wife, the "Elliotts"). Hughes argues that the circuit court clearly erred by (1) granting the petition without proof that the requirements of Ark. Code Ann. § 9-9-212 (Repl. 2020) had been met; (2) granting the petition without obtaining Hughes's consent; and (3) finding that the adoption was in the children's best interest. We find merit in Hughes's argument; accordingly, the circuit court's adoption order is reversed and dismissed.

I. *Statement of Facts and Procedural History*

Hughes and Tatum Veal were married and had four children (KJH, d/o/b July 7, 2008; MAH, DOB February 13, 2010; LLH, DOB March 19, 2011; and HJH, DOB

January 1, 2015). The family lived in Mena, Arkansas. From 2008 until 2018, Hughes worked on a pipeline in Texas and New Mexico for extended periods; however, he maintained contact with and supported his family.

In March 2017, Veal and Hughes divorced, and the resulting decree provided that they would coparent the children with no provision being made for child support. Veal and Hughes both had histories of illegal drug use, which caused the children to be placed in foster care at times, most recently from March to August 2017. During that period, both Veal and Hughes had supervised visitation with the children through the foster parents and the Arkansas Department of Human Services ("DHS").

In August 2017, with Hughes's consent, Veal regained custody of the children. Hughes subsequently sent Veal several payments to help provide for the children's support during his absence. During this period, Veal met the Elliotts and began leaving the children in their care from time to time. Roxann Elliott expressed to Veal her concern about the children's well–being because Veal allegedly was using drugs again.

Hughes, who was still working out of state, believed that the children were being cared for by Veal with assistance from the support he provided. He was unaware of Veal's alleged drug issues or that she had been leaving the children with the Elliotts; however, when he returned for Christmas in 2017, one of the children expressed concerns to him about the situation.

As a result, Hughes decided to quit his job working on the pipeline to be present for, and obtain custody of, the children. He quit his job in January 2018, moved back to Mena,

and sought assistance from DHS for a drug-and-alcohol assessment and inpatient-rehabilitation therapy.

Roxann Elliott began asserting control and threatening that she would take the children away from Veal because of her drug use. On January 13, 2019, Veal took the children to the Elliotts and asked them to keep them for her. Hughes maintained weekly supervised visitation with the children at the time.

On April 19, Hughes was admitted to an inpatient-rehabilitation program in Fort Smith. Hughes told his children that he would be leaving for a month to get his life together for them but that he would be back. That was the last time the Elliotts permitted Hughes to see his children.

During Hughes's month-long inpatient rehabilitation, DHS set a protective-services closure hearing. Additionally, the Elliotts filed to become guardians of the children. The hearings were combined and held on May 14.[1] DHS transported Hughes to the hearing from the rehabilitation facility where he unsuccessfully sought visitation and objected to the guardianship.

At the hearing, the circuit court announced Hughes's ability to continue supervised visitation but also stated that it could take up to a year for him to gain significant visitation with his children by becoming and staying drug-free and receiving counseling and that it

---

[1]The guardianship and adoption cases were not consolidated. A separate appeal of the guardianship has been filed, and the transcript of the guardianship hearing is included in the record of the guardianship appeal, CV-20-731 (dismissed Apr. 27, 2021), but is not included in this record.

3

would then be up to the children's counselor as to when unsupervised visitation could begin. The resulting order included a plan anticipating Hughes's continued visitation.

Following that hearing, the Elliotts enrolled the children in counseling with Pat Howard. Although they knew that the circuit court's order permitted supervised visitation, the Elliotts began to block Hughes's attempts to see or communicate with the children, including engaging in the false pretense that a no-contact order had been entered against Hughes. On Father's Day, Hughes went to the church the Elliotts attended, at which time the Elliotts had the pastor and a deputy sheriff ask Hughes to leave under threat of arrest. On July 7, Hughes took a birthday card to the Elliotts' house for KJH's tenth birthday and left it on their front porch at the door. The following week, Hughes went to Howard's office to discuss his options for visitation despite the obstacles from the Elliotts. The children happened to be at Howard's office, and the Elliotts called the police, alleging that a no-contact order against Hughes was in place. They told Howard that visitation was not allowed and threatened Hughes to never return to their house or they would have him arrested.

During this time, Hughes followed the circuit court's directives to reinstate visitation with his children and to work toward gaining custody. He underwent drug-and-alcohol rehabilitation programs; submitted to and consistently passed weekly drug tests; and started working regularly with a counselor. He attempted to meet with the Elliotts at Howard's office, but they threatened to have him arrested for being there. His drug screens were sent to Howard, evidencing that he continued to be drug-free. He set up a four-bedroom home in preparation for gaining visitation with, and eventually custody of, his children.

4

Howard, as gatekeeper for access to the children, did not convey to Hughes any conditions on his ability to see them other than the circuit court's order, and she stated that she wanted him to work on his relationship with the Elliotts—which was not a condition of the order. Howard acknowledged that Hughes had complied with the circuit court's requirements for visitation and that visitation with Hughes would have been appropriate, but she denied his requests because she felt like he was rude to her and the Elliotts. Hughes unsuccessfully sought assistance in setting up visitation through Howard from his counselor, Darlena Peikert, his attorney, Orvin Foster, and DHS

During this time, the Elliotts moved the children to property they owned on Highway 270, sixteen miles from town. The property is so remote that there is no cell or land-line phone service, and the nearest neighbor is a half mile away. The Elliotts testified that they took the children there so that neither Hughes nor other family members could drive by and see the children.

On August 7, 2018, Hughes's attorney filed in the guardianship case a motion for visitation[2] to compel the Elliotts to allow him the visitation that the circuit court had ordered in May. A hearing was set for August 27. Also on August 7, Hughes went to Texas under the assumption that he was going to enter a plea agreement for probation on a pending possession-of-marijuana charge, a Class A misdemeanor in Arkansas, but a felony in Texas. When he arrived in Texas, he was taken into custody and incarcerated until June 26, 2019. As a result, he missed the August 27 visitation hearing and had no means of communication

_____

[2]A first amendment to petition for reasonable visitation was later filed in both the guardianship case and in this matter on November 8, 2019.

with his children during his incarceration because the Elliotts continued to hide them away out of town and moved from location to location. During his incarceration, Hughes underwent spiritual counseling, was baptized, and completed several programs for the betterment of his spiritual and emotional well-being.

On June 14, 2019, two weeks prior to Hughes's release, the Elliotts filed for adoption of Hughes's children, but he was neither informed of nor served with the adoption petition. Hughes was released from jail on June 26, and returned to Mena on July 3, having completed halfway-house and initial parole obligations in Texas. When he returned to Mena, he met with his parole officer and then with his attorney to inquire about resuming visitation. His attorney told him that he did not believe that an adoption petition had been filed. On July 25, Hughes went to see Howard regarding resuming visitation, and Hughes and his attorney continued to try, to no avail.

Hughes reenrolled in counseling and never failed a drug screen. Within thirty days of his return, he obtained employment with Patty McCandless at her recreational ranch. Although the job was not intended to be long term, it helped him to have the flexibility to obtain his GED and complete the twelve-week substance test required by the parole office. Once Hughes's employment was established, he sent the Elliotts sixty-dollar support payments in August, September, and October 2019 when he was making only eight dollars an hour. All of the payments were rejected by the Elliotts.

The circuit court acknowledged Hughes's efforts at attempting to see his children at the March 2, 2020 adoption hearing:

I think I get the gist of the testimony has been, even up to this point in time, that Mr. Hughes has made some diligent efforts to try to get contact with his kids, and I don't think that we need to keep going over and over and over that.

To the contrary, Veal, who was incarcerated, provided consent to the adoption dated September 5, 2019; however, on February 25, 2020, Veal filed an answer generally denying all the allegations in the petition and an affidavit to proceed in forma pauperis.

Hughes called eight character witnesses, including his parole supervisor; his social worker; his former attorney; his employer; Veal's sister; his adult daughter who had been placed for adoption as a child; the SNAP E&T coordinator for Polk and Montgomery counties; and Veal's grandmother regarding his improved station in life, his relationship with his children, and his attempts to maintain contact and support them. Hughes also testified, as did the Elliotts, Howard, KJH, and MAH. The Elliotts did not put on any evidence of a home study. Prior to the hearing, Hughes requested the ability to inspect and photograph the Elliotts' properties, but his request was denied. Roxann Elliott testified that three home studies had been completed in 2018 before the guardianship hearing, but she did not know the results of those studies. Further, no study was performed in anticipation of the adoption.

On March 20, the circuit court circulated a letter opinion granting the adoption. In it, the circuit court focused on Hughes's ability to work and the fact that he had quit a job that had paid eighteen dollars an hour. Minor weight was afforded to Hughes's lengthy periods of incarceration and rehabilitation in 2018 and 2019, during which he could not work. The circuit court ruled, in part, that (1) Hughes waived statutory notice and service requirements in the adoption proceedings by applying for and agreeing to a continuance; (2) consent by the natural mother, Tatum Veal, was required and properly given; (3) the

7

statutory requirement of consent of the natural father was excused by virtue of Hughes's significant and unjustified failure to support his children for a period in excess of one year, and this determination was based on a finding by the court that Hughes made no child-support payments to the Elliotts from January 2018 until August 2019, for which the court found no justified excuse; and (4) the court ruled it was in the best interest of Hughes's children that they be adopted by the Elliotts.

The circuit court did not address whether Hughes's efforts at visitation and communication with his children had been impeded by the Elliotts, noting that only one significant failure is required to render a parent's consent to adoption unnecessary. The circuit court failed to express any additional legal grounds on which it based its judgment in favor of the Elliotts, including whether the Elliotts had obtained a home study in anticipation of adoption or had cleared background checks as required by Ark. Code Ann. § 9-9-212. On April 20, Hughes filed a motion to set aside the judgment and reopen the pursuant to Ark. R. Civ. P. 60.

The final order and decree of adoption were entered May 6, 2020. Hughes filed a timely notice of appeal on June 4, and an amended notice of appeal on June 19, after his motion was deemed denied.

## II. *Standard of Review and Applicable Law*

This court reviews adoption proceedings de novo. The circuit court's decision will not be disturbed unless clearly erroneous, giving due regard to the opportunity and superior position of that court to determine the credibility of the witnesses. *Neel v. Harrison*, 93 Ark. App. 424, 427–28, 220 S.W.3d 251, 254 (2005). A finding is clearly erroneous when,

despite evidence to support it, the reviewing court is left with the firm conviction that a mistake has been committed. *French v. Hoelzeman*, 2020 Ark. App. 543, at 1–2, 614 S.W.3d 850, 852.

Our supreme court has stated:

[T]he power of the court in adoption proceedings to deprive a parent of her child, being in derogation of her natural right to it, and being a special power conferred by the statute, such statute should be strictly construed; that 'the law is solicitous toward maintaining the integrity of the natural relation of parent and child; and in adversary proceedings in adoption, where the absolute severance of that relation is sought, without the consent and against the protest of the parent, the inclination of the courts, as the law contemplates it should be, is in favor of maintaining the natural relation. . . . Every intendment should have been in favor of the claim of the mother under the evidence, and if the statute was open to construction and interpretation it should be construed in support of the right of the natural parent.'

*In re Adoption of Glover*, 288 Ark. 59, 62–63, 702 S.W.2d 12, 13–14 (1986) (citing *Woodson v. Lee*, 221 Ark. 517, 254 S.W.2d 326 (1953)). "[A]doption proceedings, unknown to the common law, are governed entirely by statute." *Lagios v. Goldman*, 2016 Ark. 59, at 15, 483 S.W.3d 810, 820. "Adoption statutes are strictly construed, and a person who wishes to adopt a child without the consent of the parent must prove that consent is unnecessary by clear and convincing evidence." *Neel*, 93 Ark. App. at 427–28, 220 S.W.3d at 254 (quoting *In re Adoption of Lybrand*, 329 Ark. 163, 169, 946 S.W.2d 946, 949 (1997)). "Clear and convincing evidence is that degree of proof which will produce in the fact finder a firm conviction as to the allegation sought to be established." *Anderson v. Douglas*, 310 Ark. 633, 636, 839 S.W.2d 196, 198 (1992).

### III. *Analysis*

Arkansas Code Annotated § 9-9-206(2)(A) (Repl. 2020) provides that "[consent is required from] the father of the minor [to be adopted] if the father was married to the

mother at the time the minor was conceived or at any time thereafter." However, section

9-9-207 (Repl. 2020) states:

> (a) Consent to adoption is not required of:
>
> . . . .
>
> (2) a parent of a child in the custody of another, if the parent for a period of at least one (1) year has failed significantly without justifiable cause (i) to communicate with the child or (ii) to provide for the care and support of the child as required by law or judicial decree[.]

This court has held:

> It is not required that a parent fail "totally" in these obligations in order to fail "significantly" within the meaning of the statutes. It denotes a failure that is meaningful or important. Justifiable cause means that the significant failure must be willful in the sense of being voluntary and intentional; it must appear that the parent acted arbitrarily and without just cause or adequate excuse.

*Newkirk v Hankins*, 2016 Ark. App. 186, at 8–9, 486 S.W.3d 827, 833. Adopting parties

who seek to prove that a biological parent's consent is not required "bear the heavy burden

of proving by clear and convincing evidence facts which justify dispensing with the required

consent of the natural parents." *Loveless v. May*, 278 Ark. 127, 130, 644 S.W.2d 261, 263

(1983).

In this case, the circuit court stated at the adoption hearing that Hughes's "consent

is not required because the court finds he failed significantly and without justification to

support his children for more than one year." The circuit court elaborated further in its

letter ruling:

> The proof is clear here that Mr. Hughes did not provide financial care or support for his children from January 2018 to June 14, 2019. The fact that he was not ordered to pay child support by judicial decree or order does not excuse his duty to support his children. That failure on his part was significant.

It is undisputed that from the time that Hughes quit his job in early January 2018 to until early August 2019, he did not provide substantial financial support for his children. Although Hughes concedes his lack of payment, he argues that there was a justifiable cause for his lack of financial support. For a parent to fail significantly "without justifiable cause," our supreme court has held that the failure must be "voluntary, willful, arbitrary, and without adequate excuse." *Rodgers v. Rodgers*, 2017 Ark. 182, at 4, 519 S.W.3d 324, 327; *see also In re Adoption of K.F.H.*, 311 Ark. 416, at 423, 844 S.W.2d 343 (1993).

The circuit court cited *In re Adoption of T.A.D.*, 2019 Ark. App. 510, 588 S.W.3d 858, for the proposition that Hughes's imprisonment did not toll his responsibilities to his child. The facts in *T.A.D.* are distinguishable because here, there was no evidence that Hughes was gainfully employed at any time during the relevant period and hiding it without providing for his children, as was present in *T.A.D.* Hughes maintains that his nonpayment cannot be characterized as voluntary, willful, arbitrary, or without adequate excuse.

The general rule is that it is a parent's duty and obligation, independent of any court order or statute, to support his or her children,

> Once the question of child support has been submitted to a court of competent jurisdiction and a ruling thereon has been obtained, the more general statutory duty of support becomes circumscribed by the more specific duty imposed by the court. A noncustodial parent whose obligation to provide support is being supervised by such a court order cannot be said to have any "duty" to provide beyond that imposed by the court.

*Glover*, 288 Ark. at 62, 702 S.W.2d at 13.

Arkansas appellate courts have consistently held that where there is a court order that does not require support and the custodian does not request or demonstrate a need for support, the noncustodial parent's nonpayment of support is justified for purposes of

determining whether consent to a subsequent adoption is needed. *See In re Adoption of A.M.P.*, 2021 Ark. 125, 623 S.W.3d 571; *Glover, supra*; *Loveless, supra*; *French, supra*; *Neel, supra.* Arkansas appellate courts have recently reaffirmed the proposition that "if a court has expressly relieved a parent of the obligation to pay child support in an order . . . then the nonpayment of support cannot be used against the parent in a subsequent adoption proceeding. The rule makes sense and is even handed." *French*, 2020 Ark. App. 543, at 12, 614 S.W.3d at 858; *see also A.M.P., supra* (holding that a natural parent's reliance on the express terms of a divorce decree may provide justifiable cause for failing to provide any support for the child, citing *Glover* and *Loveless*).

In the instant case, neither the divorce decree nor the closure order imposed any requirement that Hughes pay child support while his children were in the custody of Veal. Moreover, the evidence indicates that Veal never sought an order of support from Hughes. The Elliotts testified that they never asked for or sought any support from Hughes, financial or otherwise, and even refused multiple support payments offered by him. The record indicates that they went to great lengths to prevent any and all contact or interaction between Hughes and the children, preventing him from fulfilling his court-ordered ability to exercise visitation and provide any means of physical, emotional, or financial support of his children.

The sole basis cited by the circuit court in its order for finding that Hughes's consent to the adoption was not required was his failure to provide "any financial support for the benefit of the girls from January 2018 up until August 2019." We reiterate that our supreme court very recently held that section 9-9-207(a)(2)(ii) requires a finding of failure to provide

both care *and* support. "Though the care component of the statutory language is often overlooked, the statute requires a failure to provide both." *A.M.P.*, 2021 Ark. 125, at 9, 623 S.W.3d at 577.

There was no finding by the circuit court that Hughes failed to provide for the care of his daughters. Immediately after moving back to Mena, from January to April 2018, Hughes attended weekly supervised visitation with the children as provided in the dependency-neglect case. On April 19, Hughes was admitted to a month-long inpatient-rehabilitation program in Fort Smith. After his return from the program, evidence indicates that the Elliotts impeded every attempt that Hughes made to interact with, or provide care for, the children. The record shows that the Elliotts moved the children to a secluded location with no access to telephones and where no one from Hughes's family could drive by as well as changed the children's schools and encouraged them to change their names.

The Elliotts' efforts to conceal the children from Hughes and prevent all communication and interaction between them is similar to the facts prompting the justifiable-cause analysis conducted in *Neel*, 93 Ark. App. at 429, 220 S.W.3d at 255 (holding that the proof of failure to support "without justification" was diluted significantly by the petitioner's refusal to accept gifts and refusal to permit contact). Consistent with our supreme court's holding in *A.M.P.*, 2021 Ark. 125, at 9, 623 S.W.3d at 577, we likewise hold that the circuit court clearly erred by assessing only Hughes's failure to provide financial support for his children and not accounting for the "care" requirement.

The circuit court clearly erred in finding that Hughes's consent to the adoption was not required based on a failure to provide for the care and support of the children for a

period of one year. Because we reverse and dismiss on this point, we need not consider Hughes's challenges to the proof of statutory requirements under section 9-9-212 or the circuit court's best-interest finding.

Reversed and dismissed.

VIRDEN and VAUGHT, JJ., agree.

*Appellate Solutions, PLLC*, d/b/a *Riordan Law Firm*, by: *Deborah Truby Riordan*, for appellant.

*Cullen & Co., PLLC*, by: *Tim Cullen*, for appellees.