

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CV-15-667

| | |
|---|---|
| DAVID NEWKIRK<br><br>APPELLANT<br><br>V.<br><br>LISA MARIE HANKINS and JAMES<br>CARROLL HANKINS<br><br>APPELLEES | **Opinion Delivered:** March 30, 2016<br><br>APPEAL FROM THE LONOKE COUNTY<br>CIRCUIT COURT<br>[NO.43PR-16-168]<br><br>HONORABLE ASHLEY PARKER, JUDGE<br><br>AFFIRMED |

## WAYMOND M. BROWN, Judge

Appellant appeals from the circuit court's final decree of adoption in which it granted the appellees' petition to adopt appellant's son, G.N., born 8/21/08; and terminated appellant's parental rights to G.N.[1] On appeal, appellant argues that the circuit court erred in finding that (1) there was clear and convincing evidence that his consent to adoption was not required pursuant to Arkansas Code Annotated section 9-9-207; and (2) it was in G.N.'s best interest for his adoption to be granted over appellant's objection. We affirm.

Appellant was arrested for attempted capital murder and kidnapping on July 31, 2009. Mary Claressa Davis (Claressa) and her husband, Jeffrey Craig Davis (Jeff) took in G.N. after appellant's arrest.[2] The Davises filed a petition for appointment as guardians of G.N. on

---

[1] The parental rights of G.N.'s mother, Tiffany Fields, were also terminated in the same order; however, Fields is not a party to this appeal.

[2] They also took in G.N.'s sister, R.N. When G.N. was subsequently taken in by appellees, R.N. was taken in by other relatives. Therefore, the outcome of her placement is not subject of this appeal.

August 27, 2009. Appellant filed a consent to the Davises' guardianship on September 11, 2009. Appellant's consent to the Davises' guardianship of G.N. was noted in the circuit court's October 27, 2009 order granting the Davises' petition for guardianship. Appellant pled guilty to the alleged offenses and was sentenced to forty years' imprisonment in the Arkansas Department of Correction (ADC) in an order entered on June 22, 2010.

The court entered an amended order appointing appellees as successor guardians to G.N. on June 19, 2013. Appellees filed their petition for adoption of G.N. on May 21, 2014. Appellant filed his response objecting to appellees' assertion that his consent was not required and denying his consent. A hearing on appellees' adoption petition was held on February 10, 2015. At the hearing, testimony was as follows.

Keith Leathers, assistant chief financial officer for the ADC, testified that between December 2, 2010, and February 5, 2015, appellant had received deposits in his account of over $13,000.00; had spent $4,658.48 of that amount on materials to make crafts; and had spent $8,959.72 of that amount on items from the canteen. He stated that appellant was permitted to have checks issued from his account pursuant to a request and approval process. He thought the process was "fairly easy" and noted that appellant was able to get checks approved for numerous leather companies to buy craft materials. He knew of no prohibition on sending money to family members.

Sky Tapp, a licensed social worker hired by appellees to do a home study, testified that she conducted adult maltreatment checks, child maltreatment checks, Arkansas State Police background checks, and driving record checks on appellees; she found that neither

was listed on any registry or had any criminal history.[3] Her walkthrough of appellees' home revealed no concerns. She observed a "great bond between the children" and a "very close bond" between G.N. and appellees. She found appellees' home to be "suitable" for adopting G.N.

Appellee Lisa Hankins testified that she had been a babysitter for G.N., with him spending "two days one week and three the next week" with her for "approximately a year" before he came to live with her and her husband in December of 2012. When she was G.N.'s babysitter, he was living with the Davises, who had guardianship of him after appellant was incarcerated. G.N. had been with the Davises since he was eleven months old. Due to the Davises' financial difficulties, appellees ended up with G.N.

Lisa stated that G.N. had not had any visits or phone calls with appellant since moving in with her in December 2012, though she acknowledged that appellant had sent sixteen letters to G.N. up through April 2014. She stated that G.N. had a "meltdown immediately," "crying hysterically," during the one visit he had with his "paternal great-grandmother."[4] Appellant had not provided any financial support to G.N. Lisa and her husband have a "close relationship" with G.N., being a "very close family" in which her children and G.N. are "very close, very protective" of one another.

---

[3] She also searched the maltreatment registries for appellees' other two children, one who was in college and the other who lived in the home at the time, and found no issues.

[4] Because this is the only mention of a paternal grandmother, this court is not sure if Lisa is actually referring to Ruth Newkirk, appellant's mother, who is G.N.'s grandmother, not his great-grandmother.

Lisa stated that G.N. went through counseling once appellees obtained guardianship over him due to his "struggles with permanency and the ins and outs" of his living arrangements and relationships. She opined that G.N. does not understand permanency and thinks that when a person leaves, "that's it; they're gone." He "doesn't understand when someone leaves they will come back."[5] Otherwise, G.N. has no medical problems. It was her understanding that the attorney ad litem and therapist were supposed to determine if contact between G.N. and appellant was to be permitted. Appellees intended not to allow communication between G.N. and appellant unless the attorney ad litem or therapists instructed them to do so. The attorney ad litem and therapist "never" recommended contact between G.N. and appellant. She stated that "if the adoption petition is not granted, nothing is going to change in [G.N.'s] life at this moment."

Appellee James Hankins testified that "even before" G.N. moved in with them, the appellees' relationship with him was "very similar to what it is today" as G.N. spent "some weekends" with appellees. Since December 2012, appellees have provided all financial support for G.N. James testified that if the adoption was not granted, he thought "everything changes" for G.N., who would be "still stuck in limbo." He reiterated G.N.'s need for permanency in light of G.N.'s belief that when people leave, they "leave forever." He stated that this—people leaving—was G.N.'s experience, having been in three homes in six years. He agreed with Lisa's testimony that he and Lisa had received no calls from appellant; that appellant had sent approximately sixteen letters since December 2012; that appellant had

---

[5] This became evident when the appellees' eldest daughter went off to college; G.N. thought she was not coming back.

provided no financial support to G.N.; and that the attorney ad litem was to determine whether contact between G.N. and appellant was permissible.

Appellant testified that he had eight in-person visits with G.N. from April 10, 2011, to November 20, 2012, due to the Davises bringing G.N. to the prison. He began writing letters monthly in 2013; all the letters were sent certified mail. He stated that he had to forward a phone visitation form to persons he wished to call, to be completed and returned by the potential visitor so they could be added to the his call list; he never stated whether he sent the form to appellees. He admitted that over $13,000.00 had come into his account from his mother and stated that he was able to write checks, having been getting them for "about a year and a half." He stated that he used $4,658.00 to purchase leather and stain to do leatherwork, which he does as a hobby and sells for "maybe five, ten, $20.00[.]" All the money in his account came from his mom as he was not able to earn money through the work-release program because he was not eligible for the program due to the crimes for which he was convicted. He received six dollars per year from the state. He would pay support to G.N. if the adoption was denied.

Appellant stated that Claressa told him she could no longer care for G.N. because it was a "financial struggle for her." He admitted contemplating putting G.N. in a foster home and admitted that he did not send her any money, though he averred that it was because he did not have any money at that time. He stated that he was not aware that he could write checks for child support, thinking he had to have a court order "until here recently." He admitted that he "was getting money deposited to his inmate bank account that [he] could have used for care and support of [G.N.,]" though he did not. He denied that the court told

him that there was nothing that prevented him from financially supporting G.N. that he remembered, though he remembered receiving the order in which the same was expressly stated.

Appellant testified that he was sentenced to forty years' imprisonment, but that he was eligible for parole January 9, 2020. He admitted that there was "a chance" that he could remain incarcerated until after G.N. reached majority. He thought it was "good that [G.N. had] a family that he's bonded with that can provide for him emotionally, financially, and give him stability" and stated that he wanted G.N. to be happy, but he wanted to be able to see his son. He had "considered that it might be traumatic" to G.N. for him to "just reappear someday and try to get back in his life after he's formed a relationship and a bond with the new family." He testified that he did not know appellees had G.N. until the guardianship hearing on the motion to substitute guardians; he did not agree to the substitution. He remembered it being said in court that G.N. could not come and visit him and he "figured that that meant that they was [sic] gonna [sic] have to let the therapist and [the attorney ad litem] decide." Though he "could have obtained this information[,]" appellant admitted that he did not contact the attorney ad litem. Finally, he testified that he is a "better person now[,]" having participated in and completed a list of "self-improvement" activities, including anger management, life skills, thinking errors, and substance abuse education.

Claressa testified that appellees obtained G.N. due to the Davises' financial difficulties that included them losing their home in December 2012 to foreclosure. G.N. would spend "one or two days a week" with appellees prior to the foreclosure, and James had always said

to the Davises "[y]ou need to just let us take care of [G.N.,]" so they gave G.N. to appellees. Appellant "was aware of [the Davises'] financial situation" as she had told him that the Davises' home was in foreclosure. Appellant, knowing nothing about the appellees, suggested putting G.N. in a group home "until [appellant] could get out." Claressa stated that appellant never provided her support because "[h]e couldn't" because "[h]e was incarcerated." She denied that it would surprise her that he had significant deposits of over $13,000.00 in his account between 2010 and 2015.

Claressa stated that after appellees obtained guardianship over G.N., they would not answer or return her phone calls and the time she was able to see G.N. became "very limited." She said Lisa told her that G.N.'s therapist advised the appellees not to allow G.N. to see the Davises. She admitted that "adoption was discussed prior to the guardianship." She thought it would be "okay" for appellees to adopt G.N., so long as she, her husband, and G.N.'s biological family "would all still be a part of [G.N.'s] life." Though she had not observed the relationship in a while, she testified that she had "observed a close bond and relationship" between appellees and G.N. She had never requested that G.N. be returned to her care.

Appellant's mother, Ruth Newkirk, testified that though she had a good relationship with G.N. prior to the appellees' guardianship, and tried to maintain it, she was not able to maintain the relationship after appellees obtained guardianship over G.N. She was not able

to establish contact with G.N. Though she had previously sought guardianship,[6] she admitted that she was not able to care for G.N. in 2009 or 2012.

The circuit court entered its final decree of adoption on April 16, 2015, granting appellees' petition to adopt G.N. and terminating appellant's parental rights. It found that appellant's consent to adoption was not necessary pursuant to Arkansas Code Annotated section 9-9-207(a)(2) because he had "willfully failed to pay child support for the minor child in excess of one year[.]" It found that adoption by appellees was in G.N.'s best interest. This timely appeal followed.

We review adoption proceedings de novo on the record.[7] Adoption statutes are strictly construed and a person wishing to adopt a child without the consent of the parent must prove that consent is unnecessary by clear and convincing evidence.[8] A circuit court's finding that consent is unnecessary due to a failure to support or communicate with the child will not be reversed unless clearly erroneous.[9] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made.[10] In cases involving minor

---

[6] Ruth sought guardianship via a petition for intervention and change of custody on March 1, 2013.

[7] *Gordon v. Draper*, 2013 Ark. App. 352, at 3, 428 S.W. 3d 543, 544 (citing *Yerby v. Yerby*, 2013 Ark. App. 25).

[8] *Courtney v. Ward*, 2012 Ark. App. 148, at 14, 391 S.W.3d 686, 694 (citing *In re A.R.*, 103 Ark. App. 1, 3–4, 285 S.W.3d 716, 717–18 (2008)).

[9] *Id.*

[10] *Id.*

children, the trial court must utilize to the fullest extent all its power of perception in evaluating the witnesses, their testimony, and the children's best interest.[11] Because the appellate court has no such opportunity, the superior position, ability, and opportunity of the trial court to observe the parties are afforded their greatest weight in cases involving minor children.[12]

Consent to adoption is not required of a parent of a child in the custody of another, if the parent for a period of at least one (1) year has failed significantly without justifiable cause (i) to communicate with the child or (ii) to provide for the care and support of the child as required by law or judicial decree.[13] It is not required that a parent fail "totally" in these obligations in order to fail "significantly" within the meaning of the statutes.[14] It denotes a failure that is meaningful or important.[15] Justifiable cause means that the significant failure must be willful in the sense of being voluntary and intentional; it must appear that the parent acted arbitrarily and without just cause or adequate excuse.[16]

---

[11] *Gordon, supra.*

[12] *Id.*

[13] *Courtney v. Ward*, 2012 Ark. App. 148, at 14, 391 S.W.3d 686, 694 (citing Ark. Code Ann. § 9-9-207(a)(2)(i) & (ii) (Repl. 2009)).

[14] *Fox v. Nagle*, 2011 Ark. App. 178, at 4, 381 S.W.3d 900, 902 (citing *Neel v. Harrison*, 93 Ark. App. 424, 220 S.W.3d 251 (2005)).

[15] *Id.* (citing *Neel v. Harrison*, 93 Ark. App. 424, 220 S.W.3d 251; *Pender v. McKee*, 266 Ark. 18, 582 S.W.2d 929 (1979)).

[16] *Courtney*, 2012 Ark. App. 148, at 14–15, 391 S.W.3d 686, 694–95.

When reviewing a finding that consent is not required pursuant to Arkansas Code Annotated section 9-9-207(a)(2), "we must inquire whether the parent has utilized those resources at his or her command . . . in continuing a close relationship with the child."[17] There is a heavy burden placed upon the party seeking to adopt a child, without the consent of a natural parent, to prove the failure to communicate or the failure to support by clear and convincing evidence.[18]

### I.      *Consent to Adoption*

Appellant's first argument is that the circuit court erred in finding that there was clear and convincing evidence that his consent to adoption was not required pursuant to Arkansas Code Annotated section 9-9-207. Specifically, he argues that the circuit court could not find that his consent was not necessary due to failure to support for a one-year period, where he was not required to pay child support by order of the circuit court and his failure to pay was due to his incarceration. He notes that "[a] noncustodial parent whose obligation to provide support is being supervised by such a court order [deciding one's duty to pay child support] cannot be said to have any 'duty' to provide beyond that imposed by the court."[19] He analogizes his case to that of *Neel v. Harrison* in which this court found that a court order

---

[17] *Reid v. Frazee*, 72 Ark. App. 474, 480, 41 S.W.3d 397, 401 (2001) (citing *In the Matter of the Adoption of Titsworth*, 11 Ark. App. 197, 201, 669 S.W.2d 8, 10 (1984) (quoting *Zgleszewski v. Zgleszewski*, 260 Ark. 629, 542 S.W.2d 765 (1976)); Ark. Code Ann. § 9-9-207(a)(2) (Repl.1993)).

[18] *Racine v. Nelson,* 2011 Ark. 50, at 11, 378 S.W.3d 93, 100 (citing *Harper v. Caskin*, 265 Ark. 558, 580 S.W.2d 176 (1979)).

[19] *See In re Adoption of Glover*, 288 Ark. 59, 702 S.W.2d 12 (1986) (citing *In re C.J.U.*, 660 P.2d 237 (Utah 1983)."

that did not require child support payments was a justifiable excuse for not supporting the party's child. [20]

In *Neel*, the circuit court had permitted adoption of Neel's daughter by her stepmother, who was three years' estranged from Neel's ex-husband, her daughter's father, at the time of the adoption. The circuit court had previously entered an agreed order in Neel's divorce from her ex-husband in which the ex-husband was awarded physical custody, but the order was silent as to an award of child support and the ex-husband did not ask for child support from Neel. The order's silence meant that Neel was not ordered by the circuit court to pay child support. However, despite having limited finances, Neel had attempted to give the child gifts; her ex-husband and his wife refused the gifts. This court found that Neel's failure to provide support was not without justification.

This case is distinguishable from *Neel*. Neel had not been specifically ordered not to pay child support, but also had not been expressly told to pay child support. In the case before us, the circuit court's October 27, 2009 order of guardianship, granting guardianship to the Davises, was silent on any requirement to pay child support. However, in its amended order appointing successor guardians of the person and the estate of G.N., entered on June 19, 2013, the circuit court stated the following:

> The Court declines to order child support based on the testimony of Tiffany Fields that she continues to be unable to provide financial support for the minor children.[21] Nothing prevents either David Newkirk or Tiffany Fields from voluntarily providing financial support for the children as they are able.

---

[20] 93 Ark. App. 424, 220 S.W.3d 251 (2005).

[21] The order specifically states that appellant declined to testify. Accordingly, the circuit court had no testimony regarding appellant's ability to provide support.

This shows that despite not being ordered to pay child support, appellant was expressly advised by the circuit court that he was not prohibited from providing support and could therefore provide support at any time, unlike in *Neel*. Accordingly, any reliance on the order by appellant would necessitate an understanding that he could provide support to G.N. Appellant knew that G.N.'s mother was not ordered to provide support. He knew the Davises were financially strapped to the point of advising him that they could no longer take care of G.N., yet he forwarded no support. He knew G.N. had new guardians, yet he failed to provide any support. We agree with the circuit court that appellant willfully failed to provide any support to G.N., noting that his failure was voluntary, and therefore, unjustifiable.

Appellant argues that appellees' refusal to accept his correspondence to his son supports finding that his failure to support was with a justifiable excuse. This argument conflates the two separate bases for not requiring consent found in Arkansas Code Annotated section 9-9-207(a)(2). That section states that consent to adoption is not required if for a period of at least one year, the parent has failed significantly without justifiable cause to communicate with the child *or* provide for the care and support of the child as required by law or judicial decree.[22] The appellees' failure to forward appellant's letters to his son has nothing to do with appellant's failure to support his son.

This court notes that in *Neel*, the circuit court noted Neel's attempts to give gifts to her daughter, but found that they were "token gifts" and "were not enough because failure

---

[22] *Courtney v. W*ard, 2012 Ark. App. 148, at 14, 391 S.W.3d 686, 694 (citing Ark. Code Ann. § 9-9-207(a)(2) (Repl. 2009) (emphasis added)).

had to be, not totally, but significantly" and Neel's support was "lacking."[23] This court found that finding to be clearly erroneous. In our case, appellant never even attempted to provide support to G.N. This was despite having more than $13,000.00 deposited into his inmate banking account.[24] The duty to support is not excused on the basis of other people's conduct unless such conduct prevents the performance of the duty of support.[25] The appellees' failure to forward appellant's letters to G.N. did not prevent him from attempting to send support to G.N. Rather than send any to G.N., he spent the overwhelming majority of the money on himself. Additionally, appellant sold leatherwork for additional, albeit minimal, income. Because appellant was specifically advised by the court that he could provide support to G.N., despite not being ordered to pay child support, and he spent a substantial amount of money on himself, rather than provide any support at all on G.N., the circuit court did not err in finding that he failed to support G.N. without a justifiable excuse. Therefore, the circuit court did not err in finding that appellant's consent to G.N.'s adoption was not necessary.

## II. *Best Interests*

Appellant's second argument is that the circuit court erred in finding that it was in G.N.'s best interest for his adoption to be granted over appellant's objection. Specifically,

---

[23] *Neel*, 93 Ark. App. 424, 427, 220 S.W.3d 251, 253.

[24] The summary of appellant's inmate banking activity shows that from December 2, 2010, to February 5, 2015, appellant received the following deposits into his account totaling $13,985.00: a $30 Christmas deposit; $2,310.00 in money order deposits; and $11,645.00 in direct deposits.

[25] *In re Adoption of A.M.C.*, 368 Ark. 369, 378, 246 S.W.3d 426, 432 (2007).

he argues that because no detriment would have come to G.N. if he had not been adopted since appellees were already his guardians, granting appellees' petition to adopt was not necessary and therefore was not in G.N.'s best interests. We disagree.

Before an adoption petition can be granted, the circuit court must find from clear and convincing evidence that the adoption is in the best interest of the child.[26] We review the evidence de novo.[27] We will not reverse a circuit court's decision regarding the best interest of a child to be adopted unless it is clearly against the preponderance of the evidence, giving due regard to the opportunity and superior position of the circuit court to judge the credibility of the witnesses.[28] We give great weight to a circuit court's personal observations when the welfare of young children is involved.[29] The mere fact that a parent has forfeited her right to have her consent to an adoption required does not mean that the adoption must be granted; the court must further find from clear and convincing evidence that the adoption is in the best interest of the child.[30] The burden rests on the one seeking adoption to prove

---

[26] *In re Adoption of K.M.*, 2015 Ark. App. 448, at 3, 469 S.W.3d 388, 390 (citing *Mode v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 69; *In re Adoption of M.K.C.*, 2009 Ark. 114, 313 S.W.3d 513).

[27] *Wilson v. Golen*, 2013 Ark. App. 267, at 8, 427 S.W.3d 723, 727.

[28] *Id.*

[29] *Sanders v. Savage*, 2015 Ark. App. 461, at 9, 468 S.W.3d 795, 801 (citing *Racine v. Nelson*, 2011 Ark. 50, at 17, 378 S.W.3d 93, 103).

[30] *Hollis v. Hollis*, 2015 Ark. App. 441, at 7, 468 S.W.3d 316, 320 (citing *Waldrip v. Davis*, 40 Ark. App. 25, 26, 842 S.W.2d 49, 50 (1992)).

by clear and convincing evidence that adoption is in the child's best interest.[31] The ultimate determination of best interest is the primary objective of the trial court in custody matters.[32]

Parental rights are not proprietary ones and are subject to the performance of duties and obligations of a parent to care for and support a child, and the law only protects the rights of parents so long as the parent discharges these duties.[33] The preference for natural parents should not be continued beyond the point where these duties and obligations have been ignored or shifted to others.[34]

The evidence presented with respect to the appellees' relationship with G.N. was all positive, showing that they had stepped up and fulfilled every role that appellant either could not or would not perform in the past and cannot or will not perform currently. This is in contrast to the following evidence regarding all other relationships in G.N.'s life. G.N.'s mother had altogether disappeared from his life. Appellant had been incarcerated since G.N. was eleven months old. In his short life, specifically the first five years, G.N. had lived with appellant, the Davises, and the appellees. His movement between homes had caused him to struggle with permanency and the idea that someone will return after they leave. His last

---

[31] *Wilson*, 2013 Ark. App. 267, at 7, 427 S.W.3d at 727 (citing *Luebker v. Ark. Dep't of Human Servs.*, 93 Ark. App. 173, 217 S.W.3d 172 (2005)).

[32] *Luebker v. Arkansas Dep't of Human Servs.*, 93 Ark. App. 173, 177, 217 S.W.3d 172, 175 (2005) (citing *Manuel v. McCorkle*, 24 Ark. App. 92, 749 S.W.2d 341 (1988)).

[33] *Apel v. Cummings*, 76 Ark. App. 93, 98, 61 S.W.3d 214, 218 (2001) (citing *Manuel*, 24 Ark. App. at 98–99, 749 S.W.2d 341).

[34] *Id.* (citing *Manuel*, 24 Ark. App. at 99, 749 S.W.2d 341 (citing *Watkins v. Dudgeon*, 270 Ark. 516, 606 S.W.2d 78 (Ark. App. 1980); *Pender v. McKee*, 266 Ark. 18, 582 S.W.2d 929 (1979)).

visit with his paternal great-grandmother resulted in G.N. having an immediate meltdown. He had had no interaction with appellant, appellant's family, or the Davises, for a number of years and was doing fine. While appellant is eligible for parole in January 2020, it is not guaranteed that he will be granted parole at that time, and he therefore could be incarcerated long after that time, even after G.N. reaches majority, as appellant admitted in his testimony. The Davises have not sought guardianship of G.N. and, while Ruth sought guardianship before, a review of the record before this court shows that she was not seeking guardianship at the hearing on appellees' petition to adopt G.N. as she had only filed a motion to establish visitation on March 31, 2014. In any case, it is not clear whether Ruth had the ability to care for G.N. on the record before us; but we note her testimony that she was not able to care for G.N. in 2009 when appellant was initially imprisoned nor in 2012 when the appellees took G.N. from the Davises.

Appellant is not asking that another guardian be found for G.N. on account of any alleged harm that might occur with appellees; only that his current guardians—the appellees—not be allowed to adopt him, so that appellant and his family's relationship with G.N. can continue. In commenting on the effect of an adoption, we have said that it is "unquestionably within the province of the legislature to decide that the reasons favoring the solidarity of the adoptive family outweigh those favoring grandparents and other blood kin who are related to the child[.]"[35] Appellant is essentially asking this court to do what the

---

[35] *Scudder v. Ramsey*, 2013 Ark. 115, at 9, 426 S.W.3d 427, 433 (citing *Wilson v. Wallace*, 274 Ark. 48, 50, 622 S.W.2d 164, 166 (1981); *Poe v. Case*, 263 Ark. 488, 565 S.W.2d 612 (1978))

circuit court rightfully would not do—to place his and his relatives' want of a relationship with G.N. over G.N.'s need for a stable and permanent home. Based on our review, and giving due deference to the superior position of the circuit court to make that determination, we cannot conclude that its finding that adoption by appellees was in G.N.'s best interest was clearly erroneous.

We further note that appellant cites *Henderson v. Callis*[36] for the proposition, as argued by appellant, that there is no clear and convincing evidence that adoption should be granted "[s]ince the minor child's condition of life would not have changed in that he would have continued to be in the custody of Appellees." This analysis is incorrect. *Henderson* stands for the proposition that incarceration of a parent, in and of itself, is not conclusive on the issue of termination of rights and does not require that the parent be deemed unfit simply because he is incarcerated. Appellant does not argue that the adoption petition was granted on this basis; therefore, *Henderson* is not on point in this case.

Affirmed.

VIRDEN and HIXSON, JJ., agree.

*Robert M. Abney, P.A.*, by: *Robert M. Abney*, for appellant.

*Melikian Law Firm*, by: *Scarlett R. Melikian*, for appellees.

---

[36] 97 Ark. App. 163, 245 S.W.3d 174 (2006).