Cite as 2021 Ark. App. 136

# ARKANSAS COURT OF APPEALS

DIVISION IV

**No.** CV-20-446

| | |
|---|---|
| IN THE MATTER OF THE ADOPTION OF J.A. AND R.A. | **Opinion Delivered:** March 31, 2021 |
| | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. 04PR-19-1044] |
| | HONORABLE DOUG SCHRANTZ, JUDGE |
| | REVERSED AND REMANDED |

## BART F. VIRDEN, Judge

Cassandra Carter appeals the Benton County Circuit Court's denial of her petition for single-parent adoption of J.A. (1/7/11) and R.A. (4/14/15).[1] We reverse and remand with instructions to the circuit court to grant the petition for adoption.

### I. *Relevant Facts*

On December 16, 2019, Carter filed a petition in the probate division of the circuit court for single-parent adoption, stating that she is the biological mother of J.A. and R.A. and that the father, Robert Bruce Alexander, consented to the adoption.[2] The probate court transferred the case to the circuit court in which the divorce was granted, and the first

---

[1]Carter changed her surname from Alexander to Carter between the filing of the petition and the first hearing on the matter.

[2]During the relationship, Alexander adopted J.A., and R.A. was born after Carter and Alexander married.

uncontested adoption hearing took place on January 15, 2020. At the hearing, Carter testified that she, J.A., and R.A. live with her parents who provide financial and day-to-day support. Carter testified that Alexander had not paid child support regularly since they divorced in 2018 and had paid support only twice in 2019. Carter explained that when the children had visitation with Alexander, they returned home with physical injuries. R.A. had a busted lip and a black eye as well as a handprint on her back. J.A. told Carter that he hated visiting his father and that "he would scream and cry" and hide under tables, refusing to go to Alexander's home. J.A. constructed tombstones in the backyard and wrote "Dad's dead" on one and made another for himself. Carter testified that J.A. had problems at school and was "kind of closed off" but that after a year of not having visitation with his father, J.A. was much happier, his grades improved, and he was making friends. The court stated from the bench that it was "not persuaded" and scheduled a second hearing for Carter to present further evidence.

The circuit court held the second hearing on February 27 at which Carter and her father, Joseph Carter, offered more detailed testimony and introduced photographic exhibits. Joseph testified that Carter, J.A., and R.A. live with him and his wife and that they are very involved in raising the children. Joseph explained that in 2012, they successfully petitioned for guardianship of J.A., and from 2012 to 2014, J.A. lived with them. After the guardianship, the Carters allowed their daughter, the children, and Alexander to live with them "a couple of times," and they had given Alexander opportunities to "step up"; however, when Alexander lived with them, Joseph observed that he was not parenting the

2

children or working. Joseph explained that "he'd sit on his butt and play video games." After Carter and Alexander divorced, Alexander exercised visitation sporadically, and Joseph explained that J.A. and R.A. "weren't the same kids" when they returned from visitation. Joseph testified that they were "filthy" and "beat down." The children came home from visitation with chigger and flea bites as well as handprints or other marks on them, which Alexander claimed happened when they "fell down." Joseph testified that the children were much happier since Alexander had ceased visitation. Since the divorce, Carter had obtained a GED and had begun substitute teaching at the children's school, and she had attended counseling. Joseph stated that he is proud of Carter for getting herself out of the bad situation.

Carter testified that she had obtained a GED and trained to become a substitute teacher, and she planned to continue her education. Carter stated that she married Alexander in 2012, her parents successfully petitioned for guardianship of J.A. the same year, and the guardianship extended through the beginning of 2014. The couple divorced in 2018, and she was given primary custody. Carter testified that for the first three months after the divorce, Alexander occasionally exercised visitation but had not done so in over a year. Carter testified that she had concerns about the children visiting Alexander before he ceased visitation. She presented photographs of Alexander's home, which were admitted into evidence, showing trash and laundry piled throughout the home; dishes piled up on the counters and in the sink; a very dirty bathroom; broken glass Christmas ornaments on the floor; and a filthy refrigerator containing dirty, empty plates and no nutritious food. Carter

explained that there were dog feces in the children's bathroom and Alexander's bedroom where R.A. slept. Carter testified that when R.A. returned from visitation, she told Carter that Alexander had hit her on her back and showed Carter a handprint that "stayed for quite a while." Carter stated that Alexander admitted he hit R.A. but that he "missed" and hit her back instead of spanking her on her bottom. When J.A. returned from Alexander's house, Carter saw marks on his neck. J.A. refused to explain what happened, saying, "I can't talk about it" and then he "shut down." Carter stated that when she asked Alexander about the bruises on J.A.'s neck, he laughed. Carter also testified that after one visit, J.A., who is allergic to insect bites, had chigger and flea bites and ticks all over him, and they had to pick ticks off of him "for hours" when he returned home. Carter submitted photos of the children's injuries and of the tick and flea bites. Carter testified that since she and Alexander separated, she and her parents have taken care of the children, and she has seen an improvement in the children since they stopped visitation. Carter stated that Alexander consulted with an attorney when he consented to the adoption, and both she and her father testified that Alexander's family has no relationship with the children.

After the testimony concluded, the court denied the petition for single-parent adoption. The court stated that it found both Joseph and Carter very credible and that Joseph was "particularly compelling." The court also stated that if the situation had been brought to the court's attention, Alexander could have been ordered to attend counseling or he could have been denied visitation rights. The court explained that if it had been informed, it would have put Alexander in jail for not paying child support "until he decides to comply

4

by paying." The court found that there was no evidence presented that Alexander was "an axe murderer" or "a great embarrassment to the children" and that if something happened to Carter, "the State of Arkansas would assume responsibility for the kids and be supporting." The court decided that it could not find that it is in the best interest of the children to "create a situation where they're without a parent when that parent exists. I can't find it's in the absolute best interest of the children to deny parentage to Mr. Alexander, no matter how sorry an individual he is." When asked for more specific findings, the court stated that all the problems stated by Carter could be addressed in other court proceedings and that the issues presented did not rise to the level of termination of parental rights.

On March 5, the circuit court entered the order denying the petition, finding that it was not in the best interest of the children to grant the adoption. Carter timely filed a notice of appeal.

## II. *Discussion*

In this one-brief appeal, Carter argues that the circuit court erred in finding that it was in the children's best interest to deny the petition for adoption in light of the evidence presented and that the circuit court erroneously applied a heightened standard in considering the best interest of the children. We agree with Carter's argument that the circuit court erred in its best-interest determination and reverse and remand with instructions to grant the petition for adoption.

We review the evidence de novo. *Kohler v. Croney*, 2020 Ark. App. 289, 602 S.W.3d 123. We will not reverse a circuit court's decision regarding the best interest of a child to

5

be adopted unless it is clearly against the preponderance of the evidence, giving due regard to the opportunity and superior position of the circuit court to judge the credibility of the witnesses. *Id*. We give great weight to a circuit court's personal observations when the welfare of young children is involved. *Id*.

Arkansas Code Annotated section 9-9-204 (Repl. 2020) provides that an unmarried father or mother of the individual to be adopted may adopt. Before an adoption petition can be granted, the court must determine that the required consents have been obtained or excused, and the court must find that the adoption is in the best interest of the child. *Newkirk v. Hankins*, 2016 Ark. App. 186, 486 S.W.3d 827. The burden rests on the one seeking adoption to prove by clear and convincing evidence that adoption is in the child's best interest. *Id*. After those two requirements are met, the court may issue a final decree of adoption. Ark. Code Ann. § 9-9-214(c) (Repl. 2020).

The testimony at the adoption hearing and the photographic evidence established by clear and convincing evidence that adoption is in the best interest of the children. The court found credible Carter's and Joseph's testimony that Alexander had not fulfilled his parental duties, had abandoned visitation with the children, had physically abused the children, and had not provided financial support. Yet, from the bench, the court stated,

> I've not heard he's an axe-murderer. I've not heard that he's a great embarrassment to—well, to your children. While they may have no relationship with him at this time, he is their dad. If something happens to you, what's going to happen to the kids? Well, I'm sure your dad, Mr. Carter, would step up and say, "I'll be responsible." But the truth is, and while he may be and I appreciate that and I fully believe he would, the State of Arkansas would assume responsibility for the kids and be supporting. I can't find this is in the best interest of the children to, in effect, create a situation where they're without a parent when that parent exists. I'm going

to deny your petition for that reason. I can't find it's in the absolute best interest of the children to deny parentage to Mr. Alexander no matter how sorry an individual he is. It is not to that level where I'm inclined to terminate that right, and, accordingly, the petition is denied.

In light of our de novo review of the record before us, we hold this was erroneous. The circuit court refused to "create a situation" in which a single parent may adopt a child "no matter how sorry an individual" the consenting parent is and stated that Carter must first exhaust all possible remedies through the contempt power of the court and through modification of the divorce decree. This is not required by the single-parent-adoption statute. The General Assembly specifically enacted this legislation to allow single-parent adoption when consent to the adoption has been given or the court finds that consent is not required and the petitioning parent proves that adoption is in the best interest of the child. The court found that consent was given and that Carter and her father offered credible testimony that she has a good support system and that Alexander abused and neglected the children; his home was unsafe for children; and he had not seen them in over a year, and in that year, the children's well-being had greatly improved. By refusing to weigh the credible best-interest evidence and by refusing to apply the single-parent-adoption statute in favor of its preferred policy that the petitioner must attempt to enforce the divorce decree, the circuit court erred.

There are two cases that we find instructive in the matter of single-parent adoption. The first is *King v. Ochoa*, 373 Ark. 600, 285 S.W.3d 602 (2008), in which our supreme court held that the plain, unambiguous language of Ark. Code Ann. § 9-9-204 provides that an unmarried father or mother of the individual to be adopted may adopt (a separate

7

issue in that case). The court also held that the circuit court erred in considering policy reasons for refusing to grant the adoption where the mother consented to the adoption. The circuit court found that

> she still has the financial responsibility to look to and provide for that child. The state and the custodial parent have the obligation to pursue that, unless they are able to take care of the child financially themselves. In the event that the custodial parent were to pass away, if I were to grant this adoption, there would be no one else out there except you and I and the state to take care of this child.

The supreme court held that the policy concern such as the one expressed by the circuit court—that the child would be dependent on the State and its taxpayers if the petitioner were to die—was not an appropriate consideration for the court and should be left to the legislature. The case was remanded for the circuit court to consider the petition on its merits. Carter urges this court to rely on *King* and hold that in the instant case, the circuit court erroneously considered the same policy that the circuit court considered in *King*; however, shortly after *King* was decided, the supreme court took up the issue of single-parent adoption again and modified its position regarding the circuit court's consideration of policy matters. In *In re Adoption of M.K.C.*, 2009 Ark. 114, 313 S.W.3d 515 (*M.K.C. II*)[3] the circuit court denied the petition for single-parent adoption, finding that there was no evidence that severing M.K.C.'s relationship with a parent with whom she already had no relationship would benefit M.K.C. The circuit court also found that adoption would sever the child's

---

[3]In *In re Adoption of M.K.C.*, 373 Ark. 603, 285 S.W.3d 605 (2008) (*M.K.C. I*) the supreme court reversed the circuit court's denial of the petition for single-parent adoption based on its misinterpretation of section 9-9-204 and remanded to the circuit court to decide the merits of the case. *M.K.C. II* is an appeal from the circuit court's decision on remand.

relationship with the biological father (who was not identified in the petition), including the child's right to inheritance and support. The circuit court found that the petitioner's testimony that M.K.C.'s father raped and abused her (the petitioner), physically abused the other children, and abused drugs lacked credibility and stated that it gave little or no weight to the petitioner's testimony. On appeal, the petitioner asserted that the circuit court erred in making its best-interest determination. The supreme court affirmed, holding that

> [i]t was Appellant's burden to present credible evidence to convince the circuit judge that adoption was in the best interest of the child. Considering the circuit court's determination that the effect of the adoption statute was speculative and that Appellant's allegations against the father could be afforded no weight, she failed to meet this burden.

*M.K.C. II*, 2009 Ark. 114, at 6–7, 313 S.W.3d at 516. The supreme court also held that in its best-interest determination, the circuit court properly considered "the relative benefits or detriments of a child, including those set out by the General Assembly." *Id.* at 4, 313 S.W.3d at 515.

*M.K.C. II* is factually distinguishable from the instant case. Here, the circuit court found very credible both Carter's and her father's testimony regarding Alexander's abuse and neglect, Carter's strong support from her family, and the children's improvement over the past year. Carter corroborated the testimony with photographs of the physical abuse and neglect and of the dirty and dangerous condition of Alexander's home. Moreover, unlike the father in *M.K.C. II*, here, Alexander was identified as the father and was represented by counsel when he consented to the adoption. Simply put, in *M.K.C. II*, the petitioner

presented no evidence regarding the best interest of the child, and in the instant case, the petitioner met the burden of proving that adoption is in the best interest of the children.

Considering the circuit court's determination that the witnesses' testimony was very credible, Carter met the burden of proving by clear and convincing evidence that it is in the best interest of the children to grant the petition. Based on our standard of review that we will reverse a circuit court's decision regarding the best interest of children to be adopted if it is clearly against the preponderance of the evidence, we reverse the circuit court's order and remand for the circuit court to enter an order granting the petition for adoption.

Reversed and remanded.

WHITEAKER, JJ., agrees.

GLADWIN, JJ., concurs.

**ROBERT J. GLADWIN, Judge, concurring**. I agree that the trial court failed to properly weigh the necessary standards in denying the single-parent adoption. I further agree that this court cannot reweigh the trial court's decision concerning witness credibility, yet I am compelled to concur. I write separately to point out that the trial court should be given great deference in determining the best interest of the child in a single-parent adoption.

Our review of the record in an adoption proceeding is de novo. *Carter v. Slater*, 2020 Ark. App. 436. The trial court must find by clear and convincing evidence that the adoption is in the best interest of the child. *Manuel v. McCorkle*, 24 Ark. App. 92, 749 S.W.2d 341 (1988).

Here, the evidence clearly shows that the father had not discharged his parental obligations. The witness testimony was consistent, and the trial court found the witnesses credible. However, I point out that the trial court is not limited to considering only the testimony of the witnesses. In *In re adoption of M.K.C.*, 2009 Ark. 114, 313 S.W.3d 513, our supreme court explained that the circuit court may weigh additional statutory rights of the child along with the testimony. In affirming the denial of a single-parent adoption, the court stated:

> In determining the best interest of the child, the court weighed the benefit of the child that would result from a separation from a biological father with which the child currently has no relationship against the detriment to the child that would result from the loss of support, right to seek support, and the right of inheritance.

2009 Ark. 114, at 3, 313 S.W.3d at 514–515. The supreme court further concluded that the circuit court in a best-interest analysis may consider the relative benefits or detriments to a child, including those set out by the General Assembly. *Id.* at 4, 313 S.W.3d at 515.

As in *M.K.C.*, the relationship between the mother and the children contemplated under Arkansas Code Annotated section 9-9-215(a)(2) (Repl. 2020) already exists. The children would gain nothing from the adoption; however, they would lose the right of support and inheritance from the father. I fail to see the loss of these rights as being in the children's best interest.

*Bradley D. Hull*, for appellant.

One brief only.