Cite as 2024 Ark. App. 579

# ARKANSAS COURT OF APPEALS
## DIVISION IV
### No. CV-23-637

| | |
|---|---|
| IN THE MATTER OF THE ADOPTION OF MC, A MINOR | Opinion Delivered November 20, 2024 |
| JAMES DAVID GARNER | APPEAL FROM THE WHITE COUNTY CIRCUIT COURT [NO. 73PR-22-165] |
| APPELLANT | |
| V. | HONORABLE ELLEN B. BRANTLEY, JUDGE |
| RHONDA MICHELLE BUNN AND PAUL BUNN | |
| APPELLEES | AFFIRMED |

**STEPHANIE POTTER BARRETT, Judge**

Appellant, James David Garner (David), appeals the decision of the Circuit Court of White County terminating his parental rights to his daughter, MC, and granting a stepparent adoption to appellee, Paul Bunn, with the consent of the mother, Rhonda Michelle Bunn (Michelle). David brings two points on appeal: (1) the circuit court erred in ruling that his daughter could be adopted without his consent, and (2) the circuit court erred in finding it was in the best interest of the child to be adopted. We affirm.

On May 17, 2022, Paul Bunn, MC's stepfather, and Michelle jointly filed a "Petition for Adoption" of MC by Paul. MC is the nine-year-old child of Michelle and David, who were never married nor lived together. Their relationship ended prior to the birth of MC on November 14, 2014, in Searcy, Arkansas. David made a brief appearance at the hospital

when MC was born. Despite Michelle's request, he failed to return to the hospital to have his name put on MC's birth certificate. David did not register with the Arkansas Putative Father Registry stating he is the father of MC. Michelle was a family-law attorney for over twenty years in White County and met Paul in April 2020 when he hired her to represent him in his divorce from Holly Hickman. Michelle was Paul's divorce attorney for around six months until he discharged her as his attorney. They were married a year later in September. At the time of the adoption hearing, they had been married for almost two years. Paul had been consistently in MC's life for nearly two and a half years at the time of the hearing for adoption. The pleadings show he is a highly decorated combat veteran of Iraqi Freedom, Desert Shield, Desert Storm, and many other missions. Paul now operates a veterans outreach program. Michelle practices veterans law, assisting Paul.

Michelle testified that David had seen MC on the day she was born and less than five times over the next nine years. Michelle testified she sent David photos of MC through emails and texts for about two years after MC's birth, but she eventually stopped because he would respond only occasionally by saying "nice" or "cute." David also admitted Michelle told him there was an open-door policy to see MC. The next time he saw MC was the first Christmas, which was the next month after her birth. He and one of his family members came by Michelle's home, and they visited for an hour or less. Michelle testified to another occasion where David came to her office to obtain power of attorney for his wife. MC was lying on a play mat in her office, and she said he did not acknowledge MC even though Michelle asked if he would like to hold her. She also testified that he had come to her home

and left Christmas gifts twice but only visited with MC for about an hour when he came with his family for her first Christmas. She also recounted seeing him at the fair when MC was a small child, but he only spoke to MC to say something related to the goldfish she was holding and walked off.

Michelle said she has a good relationship with David's mother, Loretta Scoggin, and his sister, Angie. Michelle testified that Ms. Scoggin and Angie came to several of MC's birthday parties and would sometimes come by at Christmas without David. Ms. Scoggin testified that MC spent the night with Angie on one occasion and came to her home a few times. Ms. Scoggin testified David could visit when he wanted, and he did so a few times. Ms. Scoggin said she felt threatened by Paul and stated he had refused to allow MC to show her how MC's bedroom was decorated. She admitted that Paul had not refused to allow her to visit. Ms. Scoggin testified that she had not seen or talked to MC for about two years prior to the adoption proceedings. Ms. Scoggin admitted the last time she had seen MC was a year and a half before the adoption proceedings were filed when Paul welcomed her into their home, and she visited with MC. Hanah Garner, MC's, half sister, testified that she wanted a little sister and she loved MC but admitted she hardly knew her.

David had paid child support for MC but was in arrears $4,718. The evidence showed David had paid $30,302 in support, but the child-support exhibits show at least a portion of his court-ordered payments were captured as involuntary payments rather than being voluntarily paid by David.

Michelle testified that Paul is a loving, involved father. She testified he is kind, but he brings order. She said she is a very easy-going, laid-back person, and he brings an order that she thinks is good for her children. Michelle said her oldest daughter just graduated high school, and she and Paul became really close. Michelle believes he was instrumental in her daughter's development over the last two years. She testified he is a godly man, and they pray because he had brought that to the forefront for them. Michelle testified she thinks that this example is a good example of how to live a healthy, balanced life. She said Paul is the one that reads the bedtime story to MC and takes her to school and picks her up at times. Michelle testified he attends school events with her and MC. She said, "He's the one that pats her back when she falls and, you know, he's just -- he's dad." Michelle testified that MC would be ten years old just after the hearing and had been in the home with Paul for almost two and a half years. Michelle believed that it was in MC's best interest to be adopted by Paul.

Paul testified that he is able physically, financially, and emotionally to provide for MC. He stated MC had lived with him and Michelle for nearly two years, and he had established a father-daughter relationship with her. He testified he and MC play games where "we try to scare one another." She is just a happy child with a great life. David alleged in cross-examination that Paul had been investigated by law enforcement concerning sexual abuse of his adopted son with Holly Hickman. Both the amended petitions for adoption of that child and Paul's testimony were that the minor child had a well-documented history of serious false reports to law enforcement. Among other things, he had made claims to police

that a stranger attempted but failed to abduct him, later recanting to the parents. Paul testified there was no evidence to support the sexual-abuse allegations by his adopted son. Paul testified that the FBI, Arkansas State Police, and Searcy Police Department had cleared him of the false allegations made by his former wife and his son. A criminal-history check showed that Paul has no criminal history. Paul also testified that another of his adopted children, during his divorce from her mother, alleged he hit her with a horse whip, which he denied.

In his testimony, David alleged Michelle thwarted his visitation with MC by not responding to his texts, and he finally gave up, but he did not give a time frame for when those texts occurred. He testified he was under the impression that he would be given visitation rights in writing as a reason for not visiting MC. He testified he never had any of that, so he never felt like he could pursue visitation. David admitted Michelle told him there was an open-door policy for him and his family to see MC. David also admitted to contacting Michelle by telephone approximately two years prior to the adoption hearing. In that conversation with Michelle, he agreed that Michelle consented to visits and he could start seeing MC but on the condition it would have to be consistent, and he could not come in and out of MC's life. David admitted that after that conversation, he had not tried to call, text, or do anything else in the next year and a half to pursue his desire for visitation with MC.

At the adoption hearing, David testified he put his family and children first, and he is more than willing, with open arms, to bring MC into his family and take care of her. David

5

said he refused to sign a consent to the adoption when Paul approached him about it. He testified to his efforts with his other children such, as coaching softball, helping them do homework to get good grades, and having outside activities. In his trial testimony, David said "he could not erase the past, but we have got the rest of our lives today going forward." David also testified that being the biological father, there is a place for him in MC's life. He admitted that up to this point, he may not have given maximum effort, but going forward, he believed this was the time and place for that to happen. David candidly admitted that his failure to visit was nobody's fault but his own. David expressed concerns over the allegations of abuse of Paul's two children raised in Paul's divorce from Holly Hickman.

On May 26, 2023, the circuit court entered a "Decree of Adoption" granting the adoption of MC to Michelle and Paul. The circuit court found that David's consent is not requited for the court to approve the adoption because he failed to have meaningful contact with MC over eight years without cause; that it is in the best interest of MC to be adopted by Paul; and that David's parental rights should be terminated. The court further acknowledged it was unable to grant visitation to David or his extended family and that visitation would be at the discretion of Paul and Michelle. David filed a timely appeal.

The relevant Arkansas statute provides that consent to adoption is not required of a parent whose child is "in the custody of another, if the parent for a period of at least one (1) year has failed significantly without justifiable cause (i) to communicate with the child." Ark. Code Ann. § 9-9-207(a)(2) (Repl. 2020). We construe adoption statutes strictly. *In re Adoption of Lybrand*, 329 Ark. 163, 946 S.W.2d 946 (1997). A person who wishes to adopt a

6

child without the consent of the parent must prove that consent is unnecessary by clear and convincing evidence. *Id.* We review adoption proceedings de novo, *Hollis v. Hollis*, 2015 Ark. App. 441, 468 S.W.3d 316, but we will not reverse a circuit court's finding that consent is unnecessary unless it is clearly erroneous. *Lybrand, supra.* The issue of justifiable cause is factual but one that is largely determined on the basis of the credibility of the witnesses. *Lybrand, supra.* We give great weight to a circuit court's personal observations when the welfare of young children is involved. *Id.*

The following principles apply in analyzing the consent statutes. Pursuant to section 9-9-207(a)(2), a failure to communicate without justifiable cause is one that is "voluntary, willful, arbitrary, and without adequate excuse." *Lybrand*, 329 Ark. at 169–70, 946 S.W.2d at 950 (quoting *In re Adoption of K.F.H.*, 311 Ark. 416, 421, 844 S.W.2d 343, 346 (1979)). Also, the one-year period may be any one-year period, not merely the one-year period preceding the filing of the petition for adoption. *In re Adoption of A.M.C.*, 368 Ark. 369, 246 S.W.3d 426 (2007). Finally, it is not required that a parent fail "totally" in these obligations in order to fail "significantly" within the meaning of the statute. *Id.* at 377, 246 S.W.3d at 432. The question we must now answer on appeal is whether the circuit court's finding of lack of parental contact without justification was clearly erroneous. *Anderson v. Douglas*, 310 Ark. 633, 839 S.W.2d 196 (1992).

The record reveals that except for one visit with his family on Christmas when MC was a newborn, David has had no more than five contacts with MC in nine years. David admitted that his failure to visit was nobody's fault but his own. He testified that he may

not have given maximum effort, but going forward, he felt like that this is the time and place for that to happen. David admits that he has not had any contact with MC in the last year and a half. David gave no explanation as to why he could not have visited MC by agreement with Michelle or pursued his visitation rights in court if she were uncooperative in providing him with visitation. Michelle testified that he and his family had an open-door policy for visitation. His mother and sister took advantage of the open-door policy sporadically, but David shirked his responsibility as a father. David contacted Michelle approximately two years prior to the adoption asking to have visitation. In their conversation, David admits that Michelle told him he could have visitation but that it must be consistent. David admits he did not text or call Michelle to ask for visitation in the year and a half prior to the petition for adoption. This court gives great weight to a circuit court's personal observations when the welfare of young children is involved. *In re Adoption of Perkins/Pollnow*, 300 Ark. 390, 779 S.W.2d 531 (1989); *In re Adoption of J.L.T.*, 31 Ark. App. 85, 788 S.W.2d 494 (1990). Here, the circuit court found that the proof of David's lack of communication with MC for more than a year was clear and convincing. We cannot say that the circuit court clearly erred.

We are left then with the pivotal question of whether the failure to communicate was without justifiable cause under the statute. *Anderson*, 310 Ark. 633, 839 S.W.2d 196. We do not believe the circuit court clearly erred in finding no justification for his failure to communicate with MC. Failure to communicate without justifiable cause means a failure that is voluntary, willful, arbitrary, and without adequate excuse. *Bemis v. Hare*, 19 Ark. App.

8

198, 718 S.W.2d 481 (1986); *Roberts v. Swim*, 268 Ark. 917, 597 S.W.2d 840 (Ark. App. 1980).

David presents a single reason why his lack of communication with MC was justified. David testified that he texted Michelle several times to discuss visitation, but she did not respond, and he finally quit texting her. David gave no plausible explanation as to why he could not have visited MC by agreement with Michelle or pursued his visitation rights in court if she were uncooperative in providing him with visitation. David and Michelle lived in the same small town, David had her phone number, David had delivered Christmas gifts on two occasions, and he had dropped off child support at her home but never asked to see MC. David admitted Michelle offered him an open-door policy for visitation with MC. Despite that offer, David did not take advantage of her willingness to allow visitation with MC. Approximately two years prior to the filing of the adoption petition, David called Michelle to ask for visitation with MC. Michelle agreed to the visitation but made it clear she did not want him to have an in and out relationship, which she believed was not in the best interest of MC. David admitted that after that conversation, he did not call, text, or make any other effort to communicate with MC for more than a year and a half when the petition for adoption was filed. Failure to communicate without justifiable cause means a failure that is voluntary, willful, arbitrary, and without adequate excuse. *K.F.H.*, 311 Ark. 416, 844 S.W.2d 343; *Bemis*, 19 Ark. App. 198, 718 S.W.2d 481; *Roberts*, 268 Ark. 917, 597 S.W.2d 840. The record is clear that David, by his own admission, was not thwarted in his efforts to visit MC but that his failure to have visitation was voluntary, willful, and arbitrary

9

and without adequate excuse on his part. We do not believe that the circuit court clearly erred in finding no justification for the failure to communicate.

David challenges the court's best-interest finding, and again we affirm. Before an adoption petition can be granted, the circuit court must find from clear and convincing evidence that the adoption is in the best interest of the child. *Kohler v. Croney*, 2020 Ark. App. 289, 602 S.W.3d 123; *Newkirk v. Hankins*, 2016 Ark. App. 186, 486 S.W.3d 827. We review the evidence de novo. *Id.* We will not reverse a circuit court's decision regarding the best interest of a child to be adopted unless it is clearly against the preponderance of the evidence, giving due regard to the opportunity and superior position of the circuit court to judge the credibility of the witnesses. *Id.* We give great weight to a circuit court's personal observations when the welfare of young children is involved. *Id.* The mere fact that a parent has forfeited his right to have his consent to an adoption required does not mean that the adoption must be granted; the court must further find from clear and convincing evidence that the adoption is in the best interest of the child. *Id.* The burden rests on the one seeking adoption to prove by clear and convincing evidence that adoption is in the child's best interest. *Id.* The ultimate determination of best interest is the primary objective of the circuit court in custody matters.

David argues that Paul has no contact with his adopted children, and the court did not consider MC's best interest because there were allegations of sexual abuse by Paul against his son. The circuit court specifically addressed this argument, stating these children were from a prior marriage where the allegations were thoroughly investigated by law enforcement

10

without any result indicating that Paul is a sex offender or otherwise dangerous. Michelle testified that Paul's children and grandchildren visit them frequently and have a good relationship with Paul. Michelle said her oldest daughter just graduated high school, and she and Paul became really close. The court simply did not afford David's testimony the weight that he desires and asks this court to reweigh the evidence in his favor, which we will not do. *Madison v. Ark. Dep't of Hum. Servs.*, 2013 Ark. App. 368, 428 S.W.3d 555.

David argues the court found that having two parents is better than one but failed to acknowledge Michelle's depression, brain lesions, and cognitive issues when determining to grant the adoption. Testimony was presented that Michelle had quit the practice of law since she was diagnosed with brain lesions and had migraines but that she is okay. She testified that she was assisting Paul in his work to help veterans to obtain benefits with no indication that she was not able to function in that capacity. Further, Michelle testified succinctly as to the facts relating to David's lack of attention to MC and recounted the sporadic visitations over the years by David's mother and sister. Michelle, acting as Paul's attorney, also cross-examined witnesses and argued the case with no sign of impairment noted by the court. No evidence was presented that she is not competent to raise MC.

David also argues regarding the best-interest finding that the court failed to consider the bond he had with MC and the negative impact that the adoption would have on MC's relationship with his extended family. David argues what could have been but never was because of his own actions. The court found David's relationship with MC is virtually nonexistent. Under any interpretation of the facts, David is a virtual stranger to MC because

11

he has had virtually no contact with her over the nine years of her life. The court noted Paul's stable home and employment, the fact that MC was doing well in school while in Paul's care, and the fact that MC is happy and Paul takes time with an interest in her school and home life. In contrast, David has a history of completely ignoring MC and has failed to undertake the responsibility to be a father to MC.

David also argues that adoption is not in MC's best interest because it would terminate his relationship with her half siblings, aunt, and paternal grandmother; however, the evidence demonstrated that MC had no relationship with her half siblings prior to the adoption and had not seen or heard from her grandmother or aunt in over two years. David grasps at comments made by the circuit court in the decree to show it was not in MC's best interest to be adopted because the court found that some contact with his family was a benefit to MC. Here, the court found that David's relationship with MC was virtually nonexistent. The court found that some of his family members have done more than he has. But even those contacts were sporadic, mostly consisting of attendance at birthday parties and perhaps dropping by once a year. The circuit court made the specific finding that the adoption by Paul was in the best interest of MC regardless of whether or not Paul or Michelle, in their discretion, allowed visitation by the grandmother. Here, the problem is not one of best interest of the child but the circuit court attempting to craft a remedy that cannot exist, the court undermined its own best-interest finding for purposes of the adoption. That said, the circuit court made a specific finding that it was in the best interest of MC to be adopted by Paul and Michelle based on total abdication by David of his parental responsibilities, and

the sporadic visitation by the aunt and grandmother does not override the best-interest determination.

In *In re Adoption of AP*, 2021 Ark. App. 440, 638 S.W.3d 293, we recently rejected a similar challenge by a biological father who argued that an adoption would not be in the child's best interest because it would terminate the long-term relationship between the child and his paternal grandparents. We reiterated that "the circuit court must weigh the benefits flowing to children from the granting of an adoption as opposed to weighing the disadvantages that may result from the severing of ties between grandparents and grandchildren." 2021 Ark. App. 440, at 16, 638 S.W.3d at 303. Citing *Newkirk v. Hankins*, the *AP* court explained that a circuit court evaluating whether adoption is in a child's best interest is not required to prioritize "relatives' [want of] a relationship with the child over the child's need for a stable and permanent home." *Id.* at 17, 638 S.W.3d at 303 (citing *Newkirk*, 2016 Ark. App. 186, 486 S.W.3d 827). Regardless of the comments in the decree regarding visitation with the paternal grandmother, the circuit court acknowledged it had no authority to order visitation to occur and found it was in the best interest of MC that the adoption be granted. *Skelton v. Davis*, 2021 Ark. App. 473, 639 S.W.3d 373.

When reviewing the entire evidence, we cannot say with firm conviction that a mistake has been committed. We are satisfied that the court's best-interest finding is supported by clear and convincing evidence, and we therefore affirm.

Affirmed.

VIRDEN and KLAPPENBACH, JJ., agree.

13

*Choate Law Firm, PLLC*, by: *Penny Choate Agee*, for appellant.

*Michelle Bunn*, for appellees.